**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Albert B. BOWMAN,**
**Defendant-Appellant.**

No. 85–1361.

United States Court of Appeals,
Fifth Circuit.

Feb. 24, 1986.

1194

Ronald J. Waska, Houston, Tex., for defendant-appellant.

James A. Rolfe, U.S. Atty., James T. Jacks, Asst. U.S. Atty., Dallas, Tex., for plaintiff-appellee.

Before JOHNSON and JOLLY, Circuit Judges and MITCHELL\*, District Judge.

JOHNSON, Circuit Judge:

Albert B. Bowman appeals from his conviction by a jury of three counts [1] of mail fraud in violation of 18 U.S.C. §§ 1341 [2] and 2,[3] and three counts of making false statements in connection with loan applications to federally insured banks in violation of 18 U.S.C. §§ 1014 [4] and 2. The charges

---

\* District Judge of the Eastern District of Louisiana, sitting by designation.

1. The district court granted Bowman's motion for acquittal on one of four mail fraud counts (Count III) after the presentation of the Government's case.

2. 18 U.S.C. § 1341 provides in pertinent part:
Whoever, having devised or intending to devise any scheme or artifice to defraud, ... places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, ... shall be fined not

more than $1,000 or imprisoned not more than five years, or both.

3. 18 U.S.C. § 2 provides:
(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

4. 18 U.S.C. § 1014 provides in pertinent part:
Whoever knowingly makes any false statement or report, ... for the purpose of influ-

stemmed from multiple sales and lease-backs of Bowman's medical office equipment. The convictions are affirmed.

## I. FACTS

The sale/lease-back scheme worked in the following manner. Bowman's co-defendant Charles Alexander,[5] contacted medical doctors by means of direct mail solicitations which offered substantial loans to the doctors. Upon return of a postcard by the doctor, Alexander made a personal visit to the doctor's office. Primarily, Alexander offered these doctors (like Dr. Bowman) the opportunity to participate in a sale/lease-back transaction involving the doctor's own medical office equipment. If a doctor was in need of cash, Alexander offered to arrange for that doctor to sell his office equipment to an investor doctor and then, as a part of the same transaction, lease the equipment back. Accordingly, the seller-lessee obtained the cash proceeds of the sale and reaped a tax deduction from the lease payments. On the other hand, if a doctor was interested in an investment opportunity, Alexander offered to arrange for that doctor to become the purchaser of another doctor's office medical equipment and to lease it back to the selling doctor. The purchaser-lessor was able to depreciate the equipment purchased and possibly obtain an investment tax credit. In addition, if the purchasing doctor borrowed the funds for the transaction, the interest payments were deductible. In this simple form, the sale/lease-back transaction did not violate federal law.

The scheme involving Bowman, however, was not so simple. Bowman responded to a direct mail solicitation from Alexander who then personally contacted Bowman. Bowman decided to sell his medical office equipment and lease it back in order to obtain funds to invest in another venture. Halco Financial Services of Kansas City (Halco of Kansas City), the initial purchaser-lessor of Bowman's equipment, was an investment corporation formed by Doctors John Collins and Harold West. Alexander solicited Doctors Collins and West in the described manner, and they determined to participate in a sale/lease-back transaction as a purchaser-lessor. At the suggestion of Alexander, they formed the corporation, Halco of Kansas City, to facilitate their participation in sale/lease-back transactions. Halco of Kansas City borrowed $115,000.00 to purchase Bowman's equipment.

Subsequently, unbeknownst to Halco of Kansas City, Alexander formed a Tennessee corporation titled Halco Financial Services (Halco of Tennessee).[6] Halco of Tennessee, through Charles Alexander, arranged three additional sales of Bowman's office medical equipment. In each case, Bowman executed a lease agreement and a bill of sale warranting clear title to the same equipment. In the second transaction, Halco of Tennessee assigned a lease to F & W Leasing, a partnership formed by Doctors Walters and Flory, who borrowed $115,000.00 in order to fund the transaction. The third sale was to Dr. Muckleroy, who purchased Bowman's office medical equipment with $100,000.00 borrowed from a bank. Finally, in April of 1982, Bowman's office equipment was sold for the fourth time to Financial Services and Systems, Inc., a previously existing investment corporation that handled the investments of approximately twelve Dallas, Texas area doctors. Financial Services and Systems also borrowed the $110,000.00 purchase price from a bank.

---

encing in any way the action of ... any bank the deposits of which are insured by the Federal Deposit Insurance Corporation ... upon any application, ... or loan, ... shall be fined not more than $5,000 or imprisoned not more than two years, or both.

**5.** Charles Alexander pled guilty prior to trial and is not a party to this appeal.

**6.** Bowman contended at trial that he did not know that there were two companies named Halco Financial Services, Inc. The first sale/lease-back transaction was between Bowman and Halco of Kansas City. The subsequent three transactions were arranged by Halco of Tennessee through Alexander.

In each transaction, the purchaser-lessor presented the warranty bill of sale, the lease, and a list of Bowman's equipment to a federally insured financial institution. The bill of sale did not disclose the existence of the other sales or the existence of prior security interests covering the equipment. Based on this information and the financial statements of the borrowing doctors, all the purchaser-lessors were able to obtain loans to fund the purchase of Bowman's medical equipment.

Bowman was unable to meet the combined obligations under all the lease agreements and the purchaser-lessors eventually became aware of the multiple sales. Bowman was subsequently convicted on charges of mail fraud and making false statements, as noted, and he appeals.

On appeal, Bowman makes numerous contentions. First, Bowman asserts that the evidence was insufficient to support his three convictions for mail fraud or aiding and abetting mail fraud. Second, Bowman asserts that the evidence is insufficient to support his convictions for making or causing to be made false statements to a federally insured financial institution or aiding and abetting such crime. Third, Bowman asserts that the district court erroneously denied Bowman's motion for a mistrial or alternative motion for a hearing based on Bowman's allegation that the Government failed to produce an alleged recorded statement of Bowman's, *see* Fed.R.Crim.P. 16(a)(1)(A), or material covered by *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Bowman's arguments are unavailing, and the convictions are affirmed.

## II. DISCUSSION

### A. *Sufficiency of the Evidence*

██ Bowman argues that the evidence is insufficient to support his three mail fraud convictions and his three false statement convictions. This Court applies the following standard of review.

It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. A jury is free to choose among reasonable constructions of the evidence.

*United States v. Bell*, 678 F.2d 547, 549 (5th Cir.1982) (en banc) (footnote omitted). In making this review, this Court views the evidence presented and the reasonable inferences to be drawn from it in the light most favorable to the Government. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).

### 1. *The mail fraud convictions*

██ Bowman makes numerous arguments in support of his contention that the evidence does not support his three mail fraud convictions. First, Bowman argues that the evidence was insufficient to demonstrate that he knowingly participated in a scheme to defraud *banks*. The Government did not need to prove an intent to defraud *banks* in order to demonstrate *mail* fraud. Rather, it only needed to demonstrate an intent to defraud some one person. Here, the record amply demonstrates that Bowman knowingly joined a scheme to defraud F & W Leasing, Dr. Muckleroy, and Financial Services and Systems. *See Pereira v. United States*, 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed.2d 435 (1954) (elements of mail fraud include (1) the existence of a scheme or artifice to defraud and (2) the use of the mails in furtherance of the scheme).

██ Bowman contends that fatal variances existed between the evidence and the specific allegations in the indictment. First, Bowman asserts that the Government failed to present evidence of the envelopes in which the items were allegedly mailed. Second, Count I alleged the mailing of a check made out to F & W Leasing when the evidence demonstrated that the check was made out to Halco Financial Services and endorsed over to F & W Leasing. These arguments, and others like them asserted by Bowman, fall within the category of surplussage. The Government

was not required to prove each detail or description of the alleged mailings so long as the evidence demonstrated that the mails were used in furtherance of the scheme to defraud. *See United States v. Hughes*, 766 F.2d 875, 879 (5th Cir.1985); *United States v. Goodman*, 605 F.2d 870, 886–87 (5th Cir.1979).

■ Bowman next argues that the mailed items specified in Counts I and IV were mailed a substantial time after completion of the fraudulent scheme. Bowman's argument is unavailing. "[I]t is a well-established principle of mail fraud law that use of the mails after the money is obtained may nevertheless be 'for the purpose of executing' the fraud." *United States v. Ashdown*, 509 F.2d 793, 799 (5th Cir.), *cert. denied*, 423 U.S. 829, 96 S.Ct. 48, 46 L.Ed.2d 47 (1975); *see United States v. Shaid*, 730 F.2d 225, 229–30 (5th Cir.), *cert. denied*, — U.S. ——, 105 S.Ct. 151, 83 L.Ed.2d 89 (1984). In this case, the scheme as a whole is properly characterized as a lulling scheme, and the Government amply demonstrated that the mailings were in furtherance of the scheme to defraud. *Shaid*, 730 F.2d at 230.

■ Bowman next contends that the evidence failed to demonstrate that he mailed Dr. Muckleroy a list of medical equipment. Dr. Muckleroy's business manager-wife testified that the list of medical equipment was indeed received through the mail. That evidence sufficiently supports the conviction. Bowman further contends that there was a fatal variance between the date of mailing alleged in the indictment (January 15, 1982) and the date on which Mrs. Muckleroy testified the list was received (October 22, 1981). The Government need not prove an exact date. It is sufficient if the evidence demonstrates a date reasonably near the date alleged in the indictment. The time of the offense is not an essential element of the offense charged and, generally speaking, proof of any date before the return of the indictment and within the statute of limitations is sufficient. *See United States v. Cochran*, 697 F.2d 600, 604 (5th Cir.1983); *Unit-*

*ed States v. Grapp*, 653 F.2d 189, 195 (5th Cir.1981). Here, the variance between the proof and the indictment was not fatal.

■ Finally, Bowman contends that the Government failed to prove that Allied Bank mailed the notice of assignment to Bowman as alleged in Count IV of the indictment. A mailing may be proved circumstantially. *United States v. Ledesma*, 632 F.2d 670, 675 (7th Cir.1980), *cert. denied*, 449 U.S. 998, 101 S.Ct. 539, 66 L.Ed.2d 296 (1980); *see United States v. Goss*, 650 F.2d 1336, 1343 (5th Cir.1981). The circumstantial evidence concerning the bank's customary practices was more than adequate to support the jury's determination that the mailing in fact took place.

In sum, although Bowman presents numerous contentions regarding the sufficiency of the evidence on the three mail fraud convictions, this Court concludes that the evidence, in the light most favorable to the Government, amply supports the convictions.

### 2. *The false statements counts*

In connection with each false statement conviction, Bowman contends that the evidence is insufficient to demonstrate that he had the requisite intent, i.e., knowledge, because the evidence failed to show that Bowman knew that the warranty bills of sale would be used in connection with the procurement of bank loans. This argument does not withstand close scrutiny.

■ To sustain a conviction under 18 U.S.C. § 1014, the Government must demonstrate that (1) the defendant made a "false statement or report," and (2) the defendant did so "for the purpose of influencing in any way the action of [a described financial institution] ... upon any application, advance, ... commitment or loan...." 18 U.S.C. § 1014; *see Williams v. United States*, 458 U.S. 279, 284, 102 S.Ct. 3088, 3091, 73 L.Ed.2d 767 (1982). The *mens rea* requirement of the statute requires the Government to prove that the defendant acted "with knowledge." *Unit-*

*ed States v. Lentz,* 524 F.2d 69, 71 (5th Cir.1975).

Bowman, citing *United States v. Sabatino,* 485 F.2d 540, 544 (2d Cir.1973), *cert. denied,* 415 U.S. 948, 94 S.Ct. 1469, 39 L.Ed.2d 563 (1974), asserts that the Government must demonstrate that Bowman knew that it was a bank that he intended to influence. The Government, relying on *United States v. Lentz,* 524 F.2d 69 (5th Cir.1975), contends that it is the law of this Circuit that Bowman's convictions can be sustained if Bowman received notice sufficient to create a reasonable expectation that the statement would reach an institution of the type covered by the statute.

A close reading of the *Lentz* decision, which relied heavily on the Second Circuit's decision in *Sabatino,* clearly demonstrates that the Government must prove that Bowman *knew* that it was a bank that he intended to influence. The district court so instructed the jury,[7] and the evidence is sufficient to sustain the convictions under section 1014. Consequently, even though the Government's position on appeal incorrectly states the law, the convictions are affirmed.

In *Lentz,* the defendant was charged with six counts of violating section 1014 by making false statements on mobile home loan applications. Lentz, a mobile home dealer, fabricated fictitious sales contracts and notes. These loan packages were then discounted to two savings and loan associations pursuant to a dealer agreement with a loan servicing company. The agreement provided in three places that the loan servicing company could discount the mobile

home loans to "Bank," with "Bank" being used in a generic sense.

On appeal, Lentz asserted that section 1014 required that the Government prove that Lentz directly presented false statements to a specific covered institution. The Government, of course, had not made that showing because the statements were actually submitted to the savings and loan institutions by the loan servicing company. This Court rejected Lentz's argument for the reason that the statutory purpose of the provision could be avoided "simply by insulating the presentation of false statements by the use of a third party conduit." 524 F.2d at 71.

In this context, this Court made the broad statement on which the Government presently relies:

> In our view, it is sufficient to establish that the false statement was made for the purpose of influencing the action of a covered institution, if the proof shows that the defendant received notice sufficient to create a reasonable expectation that the statement would reach an institution of the type included in the statute. *The proof need not show that it was presented directly to a covered institution.*

*Id.* (emphasis added).

Clearly, this Court was specifically concerned with whether the false statement needed to be presented directly to the covered financial institution by the defendant. This Court was not concerned with a lack of proof that the defendant *knew* that a financial institution was involved. This view is supported by the remainder of the *Lentz* decision in which this Court relies on the *Sabatino* case:

> *or caused to be made the false statement or report wilfully and with intent to influence the action of the Federal Savings and Loan Association or insured bank upon an application, advance, commitment or loan,· or any change or extension thereof.*

Record Vol. 6 at 729 (emphasis added). Clearly, the jury was not instructed in accordance with the Government's erroneous position on appeal, and Bowman does not challenge, nor did he object to, the instruction as given.

---

**7.** The district court instructed the jury in the following manner:

> Now, with respect to this section, Section 1014, there are two essential elements which must be proved beyond a reasonable doubt in order to establish the offense proscribed by this law.
>
> First, that the Defendant knowingly made or caused to be made a false statement or report concerning a material fact to a Federal Savings and Loan Association or insured bank, and; *second, that the Defendant made*

Our view is supported by *United States v. Sabatino,* 2 Cir., 1973, 485 F.2d 540, [544], which holds the government to proof that the defendant must at least have known that the statement was made to "a bank" as distinguished from "a bank insured by the F.D.I.C." *We construe the rationale of that decision as reaching a defendant's knowledge of the statement's presentation to banks generally as distinguished from a particular bank.*

524 F.2d at 71 (emphasis added).

■■■■■ This Court held in *Lentz* that the defendant need not directly present the false statement to a covered financial institution to be found guilty under the statute. Likewise, the Government need not demonstrate that the defendant knew which particular institution was involved. Nevertheless, the Government must demonstrate that the defendant knew that the statement was to be presented to a bank. Thus, while the statute cannot be avoided simply by funnelling the false statement through a third party, the Government must still prove that the defendant knew that it "was a bank that he intended to influence." *Id.; Sabatino,* 485 F.2d at 544.

■■■■ Although the evidence is not overwhelming, particularly since the Government concedes that there was no direct contact between the banks and Bowman, this Court's review of the evidence elicited at trial clearly leads to the ultimate conclusion that the evidence demonstrated that Bowman knew that the bill of sale he furnished for each transaction would be presented to a bank for the purpose of influencing a lending decision.

First, evidence of Alexander's method of solicitation was presented to the jury, and the jury reasonably could have concluded that Alexander also explained to Bowman the value of a loan in a sale/lease-back transaction at the time Alexander arranged for the original sale of Bowman's equipment. Although Bowman specifically denied that Alexander informed him of the necessity of a loan by the purchasing doctor, the jury was entitled to discredit Bowman's testimony. Second, the evidence demonstrated that the lease Bowman signed in each transaction was assignable. The jury could reasonably infer from this evidence that Bowman knew the lease would be assigned to a covered financial institution as collateral for a loan. The assignment clause in the instant case, although not as probative as the use of the word "Bank" in *Lentz* or the name of the bank in *Sabatino,* is nevertheless some evidence of Bowman's knowledge. Finally, the manager for Halco of Kansas City testified that she told Bowman that Bowman must make his lease payments on time because Halco of Kansas City needed to timely pay its lender. The evidence presented, taken as a whole and viewed in the light most favorable to the Government, sufficiently supports the three false statement convictions.

■■■■ Bowman next contends that any false statements contained in the bills of sale could not be material because the banks did not actually rely on the bills of sale in determining whether to loan any of the doctors the purchase funds. This argument is without merit. It is settled law that a section 1014 offense is "a crime of subjective intent that requires neither reliance by the lending institution nor an actual defrauding for its commission." *United States v. Davis,* 752 F.2d 963, 969 (5th Cir.1985); *United States v. Shaid,* 730 F.2d 225, 232 (5th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 151, 83 L.Ed.2d 89 (1984). The testimony indicated that each loan officer would not have granted the particular loan at issue if the officer knew of the prior sales. That evidence amply demonstrated materiality.

**B.  *The Alleged Williams' Tape***

During trial, the Government provided defense counsel with a copy of an F.B.I. 302 form which recounted an interview between the F.B.I. and one David Reed Williams, Jr., Alexander's business partner and an alleged unindicted co-conspirator. The 302 form indicated that Williams told the interviewing F.B.I. agent that Williams

had a tape recording of a conversation that included Bowman, Alexander and Williams which allegedly contained inculpatory admissions by Bowman and Alexander.

Bowman's counsel moved for a mistrial contending that Bowman was entitled to a copy of the recording pursuant to Fed.R. Crim.P. 16(a)(1)(A).[8] In addition, Bowman's counsel asked for a hearing to develop the facts surrounding the alleged tape recording. The Government advised the district court that Williams had told the F.B.I. and the United States Attorney's office that although he thought he had a tape which contained Bowman's voice, he did not, and further that the conversation was between only Alexander and himself (Williams). Bowman's counsel then argued that if Alexander admitted his participation in the scheme on the tape then the tape might serve to exculpate Bowman, in which case the Government would be required to produce the recording pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

The district court denied the motion for mistrial. It accepted the Government's assertion that a tape containing Bowman's voice did not exist. Bowman's counsel again asked for a hearing in order to develop the facts surrounding the alleged tape recording. The district court indicated to Bowman's counsel that Williams could be called at the end of testimony that afternoon. Thereafter, the record does not reflect that Bowman's counsel pursued the matter; Williams was not called at the end of the day or prior to the close of the case.

On appeal, Bowman asserts that the district court erred in refusing to grant his motion for a mistrial. As a general matter, the decision whether to grant a mistrial is within the sound discretion of the district court. *See United States v. Womack*, 654 F.2d 1034, 1040 (5th Cir.

1981), *cert. denied*, 454 U.S. 1156, 102 S.Ct. 1029, 71 L.Ed.2d 314 (1982). We find no abuse of discretion in this case.

Alternatively, Bowman asserts that the district court erred in not conducting a hearing to determine the actual facts surrounding the alleged tape recording. Contrary to Bowman's contentions, the district court did not refuse to conduct a hearing. Rather, it indicated that it would do so at the end of the day. Defense counsel thereafter let the matter drop. Given that lack of diligence, this Court finds no error. *Cf. United States v. Ben M. Hogan Co., Inc.*, 769 F.2d 1293, 1300–01 (8th Cir.1985) (defendant waived Jenks Act claim even though district court ordered Government to disclose materials because defendant's counsel rested case without mentioning to court that defendant had not received the material); *United States v. Milstead*, 671 F.2d 950, 953 (5th Cir.1982) (district court did not err in failing to hold a hearing concerning the failure of the United States to produce a statement which was doubtfully cast as *Brady* material, and which defense counsel could have obtained as readily as the Government); *United States v. Morrow*, 537 F.2d 120, 147 (5th Cir.1976), *cert. denied*, 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977) (appellant waived argument that district court erred in refusing to grant motion for mistrial and hold evidentiary hearing on whether defendant was prejudiced because jury might have seen defendant in shackles since counsel for defendant did not request the evidentiary hearing that the district court ruled would be available after trial). In the instant case, defense counsel simply abandoned the request for a hearing, and this Court deems any further objection to the district court's disposition of the motions for a mistrial and hearing to have been waived.

---

**8.** Fed.R.Crim.P. 16(a)(1)(A) provides in pertinent part:

Upon request of a defendant the government shall permit the defendant to inspect and copy or photograph: any relevant written or recorded statements made by the defendant, or

copies thereof, within the possession, custody or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government....

## III. CONCLUSION

For the reasons stated, the convictions are

AFFIRMED.