**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

No. 93-1103

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BENNY JENKINS McDOW,

Defendant-Appellant.

---

Appeal from the United States District Court
for the Northern District of Texas

---

(July 14, 1994)

Before GOLDBERG, DAVIS and DeMOSS, Circuit Judges:

DeMOSS, Circuit Judge:

Benny Jenkins McDow appeals his conviction on three counts of savings & loan fraud under 18 U.S.C. § 1014[1] and one count of using

---

[1]"Whoever knowingly makes any false statement or report ... for the purpose of influencing in any way the action of ... any [federally insured] institution ... upon any application, advance, discount, purchase, purchase agreement, repurchase agreement, discount or loan ... shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both." 18

a false Social Security number under 42 U.S.C. § 408.[2] We affirm McDow's conviction on Count 1 but reverse his conviction on the remaining counts because the evidence is insufficient to support the conviction on these counts.

FACTS

In September 1986, appellant McDow and his wife Fay McDow purchased a house and lot in Glenn Heights, Texas from Sunbelt Savings Association of Texas ("Sunbelt Savings"), which had become the owner of the property through foreclosure. Truman Rice, a real estate agent, testified that in September 1986 his agency ran advertisements on property being marketed by Sunbelt Savings. When the McDows inquired about and decided to buy the house, Rice gave them a preliminary loan application "to fill out and to take in to the mortgage company." The mortgage company to which Rice referred McDow was Sunbelt National Mortgage Corporation ("Sunbelt Mortgage"), a wholly owned subsidiary of Sunbelt Savings Association. The different roles of Sunbelt Savings and Sunbelt Mortgage are important in this appeal because only Sunbelt Savings was federally insured.[3] Rice testified that he did not make a

_____

U.S.C. § 1014.

[2]"Whoever ... for the purpose of obtaining anything of value from any person ... with intent to deceive, falsely represents a number to be the social security account number assigned by the Secretary to him ... when in fact such number is not the social security account number assigned by the Secretary to him ... shall be guilty of a felony and upon conviction thereof shall be fined under Title 18 or imprisoned for not more than five years, or both." 42 U.S.C. § 408(7)(B).

[3]The parties do not dispute that, at the time of the offense in 1986, Sunbelt Savings was a financial institution insured by

2

distinction between the two entities: "Sunbelt is how I looked at it. I basically view it as one institution, so Sunbelt something was doing the financing."

The loan application that Rice gave to McDow to fill out was obtained from the loan files of the now-defunct Sunbelt Savings and was introduced into evidence at trial. In connection with the loan application, McDow made four materially false statements, which are numbered below as in the indictment:

(Count 1): McDow provided a Social Security number that was not his own, but rather had been assigned to his son.

(Count 2): McDow stated that he had $19,236 in savings deposited at the "American Eagle Credit Union." No such credit union existed; the address McDow submitted as the credit union's was his own former business address in Dallas, Texas.

(Count 3): McDow submitted a reference letter that gave a false verification of his rental residence. The letter purported to be from Larry Cole as owner of the property at 7409 Long Canyon Trail in Dallas. At trial, a Mr. Larry Coy testified that he owned that property but that he never had rented it to McDow.

(Count 4): When Sunbelt Mortgage sought verification that McDow had the funds on deposit with the credit union, McDow caused to be submitted to the mortgage company a false "Verification of Deposit" form which purported to be from the nonexistent American Eagle Credit Union.

McDow took the stand at trial and admitted signing the loan

---

the Federal Savings and Loan Insurance Corporation ("FSLIC"), and was thus a "covered institution" under 18 U.S.C. § 1014. At trial, the government introduced into evidence a letter from the federal Office of Thrift Supervision, which certified Sunbelt Savings' insured status. We recently reaffirmed that the government must prove federal insurance status as an essential element of a § 1014 conviction, as well as to establish federal jurisdiction. United States v. Schultz, 17 F.3d 723, 725 (5th Cir. 1994). However, the government does not have to prove that the defendant knew of the institution's insured status. United States v. Thompson, 811 F.2d 841, 844 (5th Cir. 1987).

3

application and participating in closing on the house. He denied filling in the false statements and claimed that his now-deceased son filled out the loan application, telling him: "Just sign it, daddy, and [I]'ll do the rest." McDow admitted that he had never dealt with an American Eagle Credit Union and that the Social Security number on the application was not his.

On cross-examination, McDow admitted that he used a false name and Social Security number while living in California to avoid being arrested, after hearing that the FBI had a warrant out for his arrest in Texas because of the house he bought in 1986. McDow also admitted giving made-up Social Security numbers to police officers at various times when he was arrested. McDow said he did this because he wanted to avoid arrest, keep working and support his family. The government was also allowed to question McDow about his past convictions and arrests for bad checks, burglary/grand theft and being a fugitive from justice.

### Involvement of Sunbelt Savings and Sunbelt Mortgage

Sunbelt Mortgage was the named lender on the promissory note, deed of trust and related documents signed by McDow. But the mortgage company -- a wholly owned subsidiary of Sunbelt Savings -- had to borrow from Sunbelt Savings in order to fund the loan to McDow. The money used to fund the loan thus came from the federally insured deposits of the mortgage company's corporate parent, Sunbelt Savings. Barry Johnson, vice-president of Sunbelt Mortgage, testified that if the mortgage company experienced a loss on the loan, it would diminish the assets of Sunbelt Savings. However,

4

creditors of the mortgage company could not have reached the assets of the parent corporation, absent any reason to pierce the corporate veil. The subsidiary, Sunbelt Mortgage, was not federally insured and had no deposits of its own, but it had a "mortgage warehouse lending" line of credit with its corporate parent, Sunbelt Savings. Johnson testified that warehouse lending arrangements are a common way for banks and mortgage companies to do business.

There was no direct evidence that McDow knew the money he borrowed would ultimately come from Sunbelt Savings rather than Sunbelt Mortgage. There was no direct evidence that McDow knew whether either institution was federally insured, or whether he knew if Sunbelt Savings would review his loan application or have any part in his loan transaction. However, right above McDow's signature on the loan application, the following statement appears:

> "I/we fully understand that it is a federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements concerning any of the above facts as applicable under Title 18, United States Code, Section 1014."

McDow admitted signing the loan application. His signature appears on two versions of the loan application, both containing the above reference to 18 U.S.C. § 1014.[4]

---

[4]The two "loan application forms" admitted into evidence are substantially identical except that one is dated July 19, 1986, was filled out partially by hand and partially by typewriter, and is signed by Benny McDow only; the other, dated September 30, 1986, the settlement date, is filled out by typewriter and is signed by both Benny McDow and his wife, Fay McDow. Both contain the false rental residence address, the false Social Security number and the false credit union information.

McDow testified that as far as he understood, "Sunbelt bank" was the owner of the property, and "Sunbelt Mortgage Company" was to provide the loan. McDow stated that he made an effort to read all of the documents at the closing "so as not to look stupid," and because he knew the documents were important, but stated that he was not able to read everything he signed.

The defense made timely motions for a judgment of acquittal, arguing that, assuming McDow made false statements, they were made to Sunbelt Mortgage for the purpose of influencing it, not to Sunbelt Savings, the federally insured institution. The trial court denied the motions.

The jury convicted McDow on September 30, 1992 on all four counts. On January 22, 1993, the trial court sentenced McDow to one year of imprisonment on each of the three savings & loan fraud counts (to run concurrently) and five years of probation for the Social Security count. McDow filed notice of appeal on February 2, 1993. The main issue we address in this opinion is whether -- with regard to the S&L fraud counts -- the jury could reasonably conclude that McDow made his false statements with intent to influence a federally insured financial institution, as required by 18 U.S.C. § 1014.

DISCUSSION

McDow argues that his motion for acquittal should have been granted because any false statements he made in his loan application were not "for the purpose of influencing" a federally insured financial institution, but rather were for the purpose of

6

influencing the non-insured subsidiary mortgage company.

McDow's complaint is a challenge to the sufficiency of the evidence to support his conviction under 18 U.S.C. § 1014. Therefore we must: (1) consider all evidence in the light most favorable to the government; (2) accept all reasonable inferences which tend to support the jury's verdict; and (3) determine whether a rational trier of fact could have found that the evidence establishes guilt beyond a reasonable doubt.[5]

To sustain a conviction under § 1014, the government must demonstrate that the defendant (1) made a "false statement or report" and (2) did so "for the purpose of influencing in any way the action of" a federally insured institution engaged in a lending activity. United States v. Bowman, 783 F.2d 1192, 1197 (5th Cir. 1986).

Under Fifth Circuit case law interpreting § 1014, it is not required that the defendant actually make the false statement directly to the insured institution to be found guilty under the statute, nor is it required that the government show that the defendant knew which particular institution was involved.[6] The

---

[5]United States v. Huntress, 956 F.2d 1309, 1318 (5th Cir. 1992), cert. denied, 113 S.Ct. 2330 (1993). "Fact-finders have considerable leeway in drawing inferences from the evidence presented to them. They may use their common sense and evaluate the facts in light of their knowledge of the natural tendencies and inclinations of human beings." Id. at 1318.

[6]Bowman, 783 F.2d at 1199; United States v. Thompson, 811 F.2d 841, 844 (5th Cir. 1987); United States v. Lentz, 524 F.2d 69, 71 (5th Cir. 1975)(as clarified by Bowman, 783 F.2d at 1198); Williams v. United States, 102 S.C. 3088 (1982); see also United States v. Bellucci, 995 F.2d 157, 159 (9th Cir. 1993).

7

defendant does not even have to know that the institution he is trying to influence is federally insured, as long as the proof shows the insured status. Thompson, 811 F.2d at 844. But we made it clear in Bowman that "the government must still prove that the defendant knew that it was a bank that he intended to influence." Bowman at 1199 (emphasis added).

In United States v. White, 882 F.2d 250, 254 (7th Cir. 1989), the Seventh Circuit concluded that the evidence was insufficient to support the conviction. In that case, the defendant made false statements to an equipment-leasing corporation that was a wholly owned subsidiary of a federally insured bank. The government rested its whole case on trying to persuade the court that the non-insured leasing corporation -- because of its subsidiary relationship with the federally insured bank -- was itself a "covered institution" under § 1014. White, 882 F.2d at 254. The court held that the subsidiary leasing corporation was not a "federally insured bank" within the meaning of § 1014, and reversed White's conviction. The opinion noted, however, that a different strategy in the case might have resulted in White's conviction being affirmed:

> "We repeat that if White had intended by making false statements to the leasing corporation to influence the bank as well, the fact that the statements were not made to the bank would not prevent his conviction.... It would be enough if White had known that the loan he was getting from the leasing corporation would be assigned to the bank. But the government proposed no such theory of liability in this case.... It staked its all on persuading the district court and us that the leasing corporation is a bank."

Id. at 254 (emphasis added). We now apply this law to the facts presented in today's case. First, it is clear that McDow's intent

8

that his false statements influence the uninsured institution, Sunbelt National Mortgage Corp., to make a loan does not constitute a violation of § 1014. Second, an erroneously held belief by McDow that Sunbelt National Mortgage was an insured institution would also be insufficient to establish a § 1014 violation. The question therefore narrows to whether, on this record, a reasonable jury could infer that McDow <u>knew</u> that Sunbelt Mortgage would obtain the loan proceeds with which to make his loan from Sunbelt Savings or some other insured entity.

The government produced no direct evidence that McDow knew that Sunbelt Mortgage would acquire the funds to make his loan from another entity. Indeed the government does not suggest how McDow might have acquired this knowledge. The record does not address McDow's educational background; nor does it suggest that he had any particular expertise in banking matters. He worked as a coffee salesman for approximately ten years between 1979 and 1989. Thereafter he drove a truck and moved and stored furniture.

We have carefully reviewed the testimony of the witnesses who testified for the government who assisted McDow in completing this transaction. Mr. Truman Rice, the real estate agent who sold McDow the house, testified that he was not sure which of the Sunbelt institutions was financing the property. He considered Sunbelt Savings and Sunbelt Mortgage as one and the same. It is clear from this witness's testimony that he was unaware that federally insured funds played a role in financing this transaction.

Mr. Barry Johnson, vice-president and general counsel of

9

Sunbelt National Mortgage Corporation, confirmed that Sunbelt Savings was insured by FSLIC and that Sunbelt National Mortgage Company, a separate corporate entity did not have this insurance. He provided the details of the relationship between Sunbelt Savings and Sunbelt Mortgage and described how Sunbelt Mortgage obtained the funds from Sunbelt Savings with which to make the loan. But he did not testify that this information was imparted to McDow. Also, a jury could not infer from his testimony that the public generally knew that the insured institution's subsidiary mortgage company ordinarily received its funding for such loans from the insured institution. At argument the government pointed to the warning contained in McDow's application which cautioned that any false statements made therein would constitute a federal offense under 18 U.S.C. § 1014. This warning certainly may have put McDow on notice -- although erroneously -- that submission of false statements in the application to Sunbelt Mortgage would constitute a violation of § 1014. But we fail to see how this warning would enlighten Mr. McDow on the critical fact: Sunbelt Mortgage acquired the funds to make loans from an insured institution.

We conclude that on this record a reasonable jury could not find that McDow knew that the false statements he made in his application to Sunbelt Mortgage would influence any party other than Sunbelt Mortgage. Because Sunbelt Mortgage is not an insured entity, the evidence is insufficient to support an essential element of counts 2, 3 and 4 charging § 1014 violations. We

10

therefore reverse the conviction on those counts.[7]

<u>Count 1: False Use of Social Security Number</u>

The jury also convicted McDow under Count 1, the false use of a Social Security number under 42 U.S.C. § 408. We assume from the broad language of McDow's notice of appeal that Count 1 was appealed along with the other three counts, but McDow makes no argument for its reversal. In any case, the evidence clearly showed that McDow submitted his son's Social Security number in the loan application, falsely representing the number to be his own. Section 408 has no "federally insured" element; it requires only the submission of the false number to any person, "with intent to deceive." A reasonable jury could have inferred that, by submitting his son's number in place of his own, McDow had the intent to deceive. The jury could also have inferred an intent to deceive from McDow's admission on the stand that he also used a false Social Security number to avoid arrest while living in California. Therefore, the jury's verdict on Count 1 is supported by sufficient evidence, and is hereby affirmed.

CONCLUSION

For the reasons stated above, we reverse the convictions on Counts 2, 3, and 4 charging violations of § 1014. We affirm the conviction on Count 1, but vacate the sentence on that count and remand this case for resentencing on Count 1.

---

[7] This disposition of the § 1014 counts makes it unnecessary for us to address McDow's argument that the court's jury charge amounted to an impermissible constructive amendment of the indictment.

11