# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

No. 97-60785

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

HUGH KIRKWOOD HANSON,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Mississippi

_____

November 25, 1998

Before SMITH, DUHÉ, and WIENER, Circuit Judges.

Wiener, Circuit Judge.

Defendant-Appellee Hugh Kirkwood Hanson was convicted by a jury of bank fraud,[1] misapplication of bank funds,[2] and making a false bank records entry.[3] The district court granted Hanson's post-verdict motion of acquittal. Based on a review of the record and the applicable law, we reverse the district court, reinstating the jury verdict against Hanson on all three counts and remanding for sentencing.

_____

[1] 18 U.S.C. § 1344(1).

[2] 18 U.S.C. § 656.

[3] 18 U.S.C. § 1005.

I.

FACTS AND PROCEEDINGS

We set forth the facts in the light most favorable to the verdict.[4]  In 1994, Hanson moved to Gulfport, Mississippi to become president of the Gulfport branch of the Sunburst Bank (now known as Union Planters Bank of South Mississippi) ("the Bank").  As branch president, Hanson was in charge of all bank account and lending operations of the Bank.  Soon after his move to Gulfport, Hanson became interested in building a house on a particular lot located in the Greenview section of the city.  The lot was owned by Paul Ellis, a local businessman and a customer of the Bank ("Greenview Property").

Ellis initially planned to build a "spec house"[5] on the lot, but changed his mind when he was approached by Hanson about building his own house on the lot instead.  Ellis agreed to permit Hanson to arrange for construction of a custom-built house on the Greenview Property, with the necessary financing to be obtained through the Bank in Ellis's name, and on the understanding that Hanson would occupy the house at completion, subject to his obtaining permanent financing.  Under this arrangement, Hanson would not pay Ellis anything for the cost of building the house; instead, Hanson's financing would replace the construction loan in Ellis's name, the proceeds of which would have been used to pay the costs of constructing Hanson's house.

---

[4]See United States v. Schintzer, 145 F.3d 721, 724 (5th Cir. 1998) (reciting facts as most favorable to guilty verdicts after district court's post-verdict grant of acquittal).

[5]A "spec house" is one built by a home-builder on land he owns, in anticipation of selling the improved property on the open market.  A "custom-built house" is one built according to agreed-upon plans and specifications, pursuant to a construction contract between a prime contractor and a landowner.

2

As branch president, Hanson supervised construction lending to local contractors, including a local home-builder, Turner-Wallace.  In addition to obtaining construction financing routinely from the Bank, Turner-Wallace maintained an ordinary commercial checking account at the Bank.  After reaching his agreement with Ellis, Hanson entered an oral contract with Turner-Wallace to construct a custom-built house on the Greenview Property.  Hanson selected the design and supplied Turner-Wallace with the plans for the house.  After construction began, Hanson supervised the project, selecting the interior finishes and visiting the site regularly.  Ellis, by contrast, had virtually no involvement with the project and had no direct contact with Turner-Wallace once construction commenced.

In December 1994, Hanson approved a $133,600 loan —— in Ellis's name —— for construction of Hanson's house on the Greenview Property.  The credit proposal made no mention of Hanson's involvement in the project or interest in the house.

Some time after construction began, Hanson modified his house plans to include an additional 500 square feet.  Because Hanson's authority alone was not sufficient to approve the larger loan ($151,200) required for the expanded project, the credit proposal was forwarded to a more senior Bank official for his approval as well.  Once again, the credit proposal, which Hanson prepared, did not reflect his interest or involvement.  On the contrary, it stated that "Mr. Ellis added 500 additional square footage."

On the same day that Hanson signed the credit renewal proposal in Ellis's name, Hanson and Ellis signed a quitclaim deed transferring the property from Ellis to Hanson; however, the deed was not filed in the public records until more than four months after it was signed by Hanson and Ellis.

Although some of Hanson's subordinates at the branch were aware that he was constructing a house, no bank officials outside the branch were aware of Hanson's involvement in the house project for which he served as loan officer. Moreover, when a secretary in the Gulfport branch confronted Hanson about the loan arrangement, he became angry and questioned her loyalty to him. Shortly thereafter, she was transferred to another branch. At trial, bank officials testified that, because of the potential conflict in such a situation, the Bank would have never allowed Hanson to participate in the approval and supervision of the construction loan had his interest been revealed.

For construction loans, rather than turning over the entire proceeds of the loan to the builder at once, the Bank typically releases only a portion of the proceeds at a time —— a "draw" —— triggered by the builder's completion of a specified portion of the construction project. Interest begins to accrue only when a draw is made and then only for the portion of the loan proceeds that is released. In supervising the subject construction loan, Hanson personally controlled the timing of the draws. Contrary to customary practice, though, Hanson did not rely on an outside appraiser or other Bank personnel to make periodic inspections to determine when draws should be made on his house.

Turner-Wallace became concerned about Hanson's delays in making such draws and remitting them to the contractor. When Ann Wallace of Turner-Wallace voiced her concerns to Hanson about these delays, he told her that he was intentionally delaying to save interest on the loan. As a result of Hanson's delays, the Turner-Wallace commercial account became seriously overdrawn.

Despite the overdrawn status of the account, Hanson told Turner-Wallace to continue to

**4**

pay bills for the Greenview Project, assuring the contractor that the Bank would cover the checks. Although Turner-Wallace's account had no overdraft protection, over a period of several months, Hanson instructed Bank personnel to "force-pay" the checks, including several that Hanson had endorsed and that were payable to "cash" to reimburse him for his house expenses.[6] Eventually, the overdrafts exceeded the amount that the Bank had agreed to lend to Turner-Wallace, resulting in a deficiency of more than $24,000.

Even though the Bank's operations manager expressed her concern regarding the state of Turner-Wallace's account, and even though state law requires banks to close accounts that are continuously overdrawn for 30 days or more, Hanson did not close the Turner-Wallace account until the contractor had finished the construction of his house. Moreover, when Hanson finally did close the account in May 1995, he did not follow the normal bank procedure of notifying the customer and referring the amount for collection. Rather, he closed the account without giving any notice to Turner-Wallace and simply ordered the overdraft amount to be charged off without first attempting to collect the deficiency. It was not until May of 1996, after the FBI had begun to investigate his conduct, that Hanson repaid the Bank the charged-off amount of $24,134.

After Turner-Wallace completed construction of the house, Hanson applied to the Bank for permanent financing. Hanson met with Rebecca Kelly, a mortgage lender from another branch of the Bank. He told Kelly that he already owned the house and that he wanted to "refinance" an existing construction loan in his name. The Bank does not require a customer to make a down

---

[6]Three of these checks were the subject of the misapplication of funds counts. The jury found Hanson guilty as to a $2,279.54 check, but acquitted him as to two smaller checks of under $1,000. There was evidence that the head teller had the authority to force-pay checks for less than $1,000, but required Hanson's approval to force-pay checks of $1,000 or more.

payment when refinancing a loan on a home that he already owns, as it does in connection with a new mortgage loan.  Kelly alerted Hanson that the construction loan did not appear on his credit report, so Hanson sought to recruit the loan secretary at the Gulfport branch to tell the credit bureau that he was the borrower on the construction loan.  When the loan secretary refused, Hanson approached a second Bank employee, who initially resisted but eventually agreed to make the misrepresentation.  The credit bureau then changed Hanson's credit report to include the construction loan, and Hanson obtained refinancing from the Bank without having to make a down payment.

On this evidence, the jury convicted Hanson of bank fraud, misapplication of bank funds, and making a false bank records entry.  Reasoning that (1) Hanson was nothing more than an "optionee" with no binding obligation to purchase the house, and (2) the government had not proved that Hanson intended to deceive the Bank for his own benefit, the district court entered a judgment of acquittal on all counts, prompting the government to appeal.

II.

ANALYSIS

A.    Standard of Review

We accord no deference to the district court's decision to grant a post-verdict judgment of acquittal.[7]  Instead, we must decide de novo "whether the relevant evidence, viewed in a light most favorable to the government, could be accepted by a jury as adequate and sufficient to support the

---

[7]United States v. Mulderig, 120 F.3d 534, 550 (5th Cir. 1997), cert. denied, 118 S. Ct. 1510 (1998); United States v. Baytank (Houston), Inc., 934 F.2d 599, 616 (5th Cir. 1991).

conclusion of the defendant's guilt beyond a reasonable doubt."[8] As with sufficiency-of-the evidence review, the evidence need not "exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt . . . . A jury is free to choose among reasonable constructions of the evidence."[9]

B.      Bank Fraud

To prove that Hanson committed bank fraud, the government was required to show that he knowingly executed, or attempted to execute, a scheme to defraud a federally-chartered or -insured financial institution.[10]  A scheme to defraud includes "any false or fraudulent pretenses or representations intending to deceive others in order to obtain something of value, such as money, from the institution to be deceived."[11]  "The requisite intent to defraud is established if the defendant acted knowingly and with the specific intent to deceive, ordinarily for the purpose of causing some financial loss to another or bringing about some financial gain to himself."[12]  Hanson does not challenge that the Bank is federally insured.

The government asserts that Hanson's scheme to defraud comprehended the use of the Bank's money to finance his home construction without disclosing his interest in the project, thereby allowing himself to retain control of the construction loan and manipulate the loan process to his benefit and to the Bank's detriment.  Echoing the district court, Hanson responds that the government failed to

---

[8]Id. (quotation and citation omitted).

[9]Id.

[10]United States v. Restivo, 8 F.3d 274, 280 (5th Cir. 1993).

[11]Unite States v. Saks, 964 F.2d 1514, 1518 (5th Cir. 1992).

[12]Id.

prove intent because the evidence shows that he was simply an "optionee" on the house, and fails to show that he profited or hoped to profit from his actions. Hanson further asserts that the government never proved a specific amount of interest that the Bank lost as a result of Hanson's actions.

Our review of the record leads us to the conclusion that the jury could have reasonably believed that, by failing to disclose his interest in the house, Hanson was able to retain control of the construction loan and thus disregard the Bank's normal practice of having an outside appraiser or other Bank personnel conduct periodic inspections of the property to determine when construction draws should be made.[13] This, in turn, would support a jury determination that Hanson was thus able to save interest and reduce the cost of the construction loan, which his permanent mortgage loan later replaced.

As we stated in Saks,

> [I]f a borrower obtains funds at the insistence of and for the benefit of a bank officer, without disclosing the officer's interest on the loan documents, thereby knowingly flouting banking rules and regulations designed to protect the financial integrity of the bank, a jury can conclude that both the borrower and officer acted with intent to defraud the bank.[14]

In addition to showing that Hanson benefited from delaying the construction draws, the government produced evidence that he profited by falsely claiming that his permanent financing was

---

[13]See United States v. Cauble, 706 F.2d 1322, 1355 (5th Cir. 1983) (considering defendant's "disregard for the bank's routine practices" relevant to intent to defraud).

[14]Saks, 964 F.2d at 1519. Hanson's assertion that the government did not prove his intent because it did not establish the specific amount of interest that Hanson saved on the loan due to his delays of the construction draws is wholly without merit. The government "had only to prove that [the Bank] . . . was at risk, not that an actual loss occurred." Lemons, 941 F.2d at 315. The Government, therefore, did not have to prove the Bank suffered a loss at all, let alone the specific amount of its loss. The jury could reasonably conclude that Hanson's handling of the construction loan, at a minimum, placed the Bank at risk.

simply a refinancing of an existing loan in his name, thereby avoiding the need to make a down payment. Significantly, in his effort to avoid the down payment requirement, Hanson recruited subordinant Bank personnel to misrepresent to the credit bureau that he was the borrower on the construction loan.[15]

Hanson does not deny that he recruited the Bank employees to lie on his behalf. Rather, he argues —— for the first time on appeal —— that the mortgage company from which he received his permanent financing, Union Planters Mortgage, although a subsidiary of the Bank, was distinct from the Bank for the purposes of proving his intent to defraud. Hanson's argument borders on frivolousness.

To prove bank fraud, "it is not required that the defendant actually make the false statement directly to the insured institution . . . ."[16] The government need only prove that "the defendant knew it was a bank that he intended to influence."[17] As Hanson undoubtedly knew by virtue of his position in the Bank, the funds for his loan were issued by the Bank to the mortgage company, a related entity, through a direct line of credit. Even if Hanson were somehow unaware of this arrangement, numerous mortgage loan documents refer specifically to the Bank. The jury could easily conclude that Hanson knew that it was the Bank that he intended to influence when he recruited a co-worker

---

[15]See United States v. Kington, 875 F.2d 1091, 1105 (5th Cir. 1989) ("The jury could . . . have inferred from the admitted falsehood that defendants were trying to hide something from the bank that the bank should have known, and that they had a bad purpose for the falsehood."); United States v. Aubin, 87 F.3d 141, 146 (5th Cir. 1996), cert. denied, 117 S. Ct. 965 (1997) (defendant bank official "knew he could not tell the members of the loan committee the truth about the transaction").

[16]United States v. McDow, 27 F.3d 132, 135 (5th Cir. 1994); see also United States v. Bowman, 783 F.2d 1192, 1198 (5th Cir. 1986).

[17]Bowman, 783 F.2d at 1199.

to lie about the construction loan.

C.     Misapplication of Bank Funds

To prove that Hanson misapplied bank funds, the government was required to show that (1) Hanson was an officer or employee of the Bank; (2) the Bank was federally insured; (3) Hanson knowingly and willfully misapplied funds belonging to or entrusted to the Bank; and (4) Hanson acted with the intent to defraud the Bank.[18]

The government contends, and the jury found, that Hanson willfully misapplied Bank funds for his own use by causing the Bank to force-pay a $2,279.54 check that was written in overdraft on the Turner-Wallace account and used to reimburse him personally for expenditures he made on his own house. Hanson again asserts that the government failed to prove that he intended to defraud the Bank in connection with the $2,279.54 check.

"Intent in a § 656 case is 'basically a question for the jury.'"[19] Hanson instructed Ann Wallace to continue to write checks despite the overdrafts resulting from his delays in making the draws for the purpose of avoiding interest expense to himself —— and thereby depriving the Bank of an equal amount of interest income. He directed Bank personnel to force-pay the checks even though Turner-Wallace's account had no overdraft protection and the amount and duration of the overdrafts was unprecedented. Furthermore, Hanson failed to inform bank personnel that the checks he was instructing them to force-pay included the $2,279.54 check for him. Contrary to regular Bank practice, Hanson delayed closing the Turner-Wallace account until after the construction of his house was complete. Finally, he caused over $24,000 to be charged off as an uncollected loss to the Bank

---

[18]18 U.S.C. § 656; Kington, 875 F.2d at 1100.

[19]Cauble, 706 F.2d at 1355.

**10**

—— $24,000 that had been used by the contractor to increase the value of Hanson's house —— and only repaid the Bank when the noose began to tighten around his neck. In light of this evidence, the jury could reasonably conclude that Hanson's non-routine orchestration of the overdrafts constituted a misapplication of funds.[20]

D.    False Entry

To prove that Hanson committed a false entry violation, the government was required to show that (1) the Bank was federally insured, (2) Hanson made a false entry in a book, record, or statement of the Bank; (3) Hanson made the entry knowing it was false; (4) Hanson made the entry with the intention of defrauding the Bank.[21] As with the bank fraud and misapplication convictions, there was more than sufficient evidence to support the jury's determination that Hanson caused a false entry to be entered into the Bank's records.

In the supplemental credit proposal that he prepared for the expanded construction project, Hanson (1) renewed the loan in Ellis's name, (2) described the loan as related to "Construction of Spec House;" and (3) falsely represented that the loan renewal was required because "Mr. Ellis added 500 additional square footage."

Hanson argues that his description of the house as a spec house was technically accurate. Given Hanson's interest in the house, his control of its construction, and the fact that he and Ellis signed a deed transferring the property to Hanson the same day that the report was submitted, the jury could reasonably reject as highly misleading Hanson's characterization that the loan was for construction by someone else of a "spec house" in which Hanson had no interest. Bank officials

---

[20]Id. (defendant's "disregard for the bank's routine practices" relevant to intent to defraud).

[21]Kington, 875 F.2d at 1104.

testified that Hanson would not have been permitted to retain control over the loan had he revealed his interest in the project.  By characterizing the loan as one for a "spec house," rather than as a loan for a house being custom-built for himself, Hanson was able to retain that control and manipulate the loan process to his benefit.[22]

Hanson further argues, once again for the first time on appeal, that because the indictment did not make specific reference to the statement that "Mr. Ellis added 500 additional square footage," the government's reliance on this statement in support of the convictions constitutes an impermissible constructive amendment of the indictment.[23]  This assertion cannot withstand scrutiny.

"A constructive amendment to the indictment occurs when the jury is permitted to convict the defendant on a factual basis that effectively modifies an essential element of the offense charged in the indictment."[24]  Not all factual variations, however, rise to the level of a constructive amendment.[25]  Moreover, a "constructive amendment cannot occur where the indictment completely and accurately describes the conduct [of the defendant] . . . ."[26]

The indictment charged that Hanson "failed to disclose in connection with the renewal loan . . . [that] the home in question was being built for [Hanson] according to plans provided by [Hanson]

---

[22]See United States v. Cordell, 912 F.2d 769, 773 (5th Cir. 1990) ("[A]n omission of material information qualifies as a false entry" for purposes of 18 U.S.C. § 1005).

[23]See United States v. Salvatore, 110 F.3d 1131, 1145 (5th Cir.), cert. denied, 118 S. Ct. 441 (1997) ("Only the grand jury can amend the indictment to broaden it.").

[24]United States v. Millet, 123 F.3d 268, 272 (5th Cir. 1997), cert. denied, 118 S. Ct. 1306 (1998).

[25]Id.

[26]United States v. Mikolajcyk, 137 F.3d 237, 243 (5th Cir.), cert. denied, 119 S.Ct. 250 (1998).

and <u>the defendant had made numerous decisions on the construction of the home</u> . . . ." Hanson's

representation that Ellis had caused the change in the construction plans was made in effectuating

Hanson's decision to submit the credit proposal, a decision Hanson had made in connection with the

construction of the home.[27] The indictment, therefore, accurately describes Hanson's conduct and

no constructive amendment occurred.

---

[27]<u>See</u> <u>Salvatore</u>, 110 F.3d at 1145-46 (holding government did not constructively amend
indictment when specific conduct government proved at trial adequately described by general
language in indictment).

III

CONCLUSION

For the foregoing reasons, we reverse the district court's judgment of acquittal on the bank fraud, misapplication of bank funds, and making a false bank records entry counts, reinstate the jury's verdict of guilty, and remand for entry of a judgment of conviction and sentencing.

REVERSED and REMANDED for sentencing.