## FOSTER et al. v. UNITED STATES.
### No. 1177.

Circuit Court of Appeals, Tenth Circuit.
March 16, 1935.

Howard Dailey, of Dallas, Tex. (George R. Craig, of Albuquerque, N. M., on the brief), for appellants.

184

Gilberto Espinosa, Asst. U. S. Atty., of Albuquerque, N. M. (Wm. J. Barker, U. S. Atty., of Santa Fé, N. M., on the brief), for the United States.

Before LEWIS, McDERMOTT, and BRATTON, Circuit Judges.

BRATTON, Circuit Judge.

Appellants were indicted in four counts. The first charged that they "unlawfully, wilfully, knowingly, feloniously, and with intent to defraud, each did falsely alter a certain obligation of the United States, to-wit, a United States Note in the denomination of Five and no/100ths ($5.00) Dollars, Series of 1928, Serial Number C46904308A, and which said genuine obligation of the United States was altered in this, in that the said Serial Number was changed to read C46904803A, and the Check Letter 'D' was altered to read 'I' and the Face Plate number changed from '342' to '3,' contrary to the form of the statute in such case made and provided and against the peace and dignity of the United States."

The second charged similar alterations in the check letter and face plate number of a different United States note of $5 denomination. The third and fourth charged respectively sales of the described altered notes to I. Billington. The first and second were drawn under section 148 of the Criminal Code, and the third and fourth under section 151 thereof (18 USCA §§ 262, 265).

A demurrer was lodged against the indictment on the grounds: First, that the altered instruments were not set forth in hæc verba or in tenor and effect, and, second, that the alleged alterations were not material. The demurrer was overruled and appellants were convicted on all counts.

■ The first question engaging our attention is the action of the trial court in overruling the demurrer. An indictment should charge the offense in the language of the statute with sufficiently definite averments to advise the accused with reasonable certainty of the crime with which he is charged, to enable him to prepare his defense, and after judgment be able to plead the record and judgment in bar to a subsequent prosecution for the same offense. The indictment here described the instruments in detail. Their denominations, serial numbers, plate numbers, and check letters were stated with precision. The changes made were alleged clearly and definitely. United States notes circulate quite widely, and every one is thoroughly familiar with them. Appellants could not have failed to understand the crimes with which they were charged as thoroughly as though the instruments were pleaded in hæc verba. They were furnished the information necessary to prepare their defense, and certainly enough was set forth to sustain the record and judgment as a bar to further prosecution for the same offenses. The contrary is not asserted. It is merely contended that the instruments should have been pleaded in hæc verba. The contention is a technical one and presents no merit because the rights of appellants were not prejudiced in any wise. Dell Aira v. United States (C. C. A.) 10 F.(2d) 102; Blum v. United States (C. C. A.) 46 F.(2d) 850; Davis v. United States (C. C. A.) 49 F.(2d) 267; Hagner v. United States, 285 U. S. 427, 52 S. Ct. 417, 76 L. Ed. 861.

■ The offense denounced by section 148, supra, is the alteration of an obligation of the United States with intent to defraud. The alteration need not be one which destroys or impairs the validity of the obligation. It is enough if an alteration is made in furtherance of a scheme to defraud and it is not necessary that the United States be the intended or actual victim of the scheme. An alteration made as a material part of a scheme to defraud any person comes within the terms of the statute. Crouch v. United States (C. C. A.) 298 F. 437. The test, therefore, is whether the alterations in question were material to a scheme to defraud. The scheme was to convince Billington that through a chemical and rolling process appellants were producing replicas of genuine $5 bills, to persuade him to furnish $2,500 in new bills of five, ten, and fifty dollar denominations under the pretext that they would make replicas and divide the profit, but in fact to abscond with the money thus furnished. In order to convince him that they were producing replicas of genuine notes, it was necessary to exhibit to him two bills bearing the same serial numbers, check letters, and face plate numbers. That was accomplished by the alterations set forth in the indictment. The alterations were not only material to the fraudulent scheme, but they were essential to it. They were the essence of it in the sense that the fraud could not be effected without them. Plainly, the contention that they were immaterial cannot be sanctioned.

■ Next, it is urged that the evidence is not sufficient to support the verdict. Appellants were together in Albuquerque, N. M. They

went to a place conducted by Leopoldo Arias, and requested Arias to take them to Belen, stating that they desired to enter a big game of poker. Arias took them to a pool hall in Belen operated by Rafael Baca and introduced them to Baca. Foster went under the name of Smith and Dillard under the name of Anderson. Foster told Baca that he wanted to meet Billington. He then went to Billington's residence in Belen and asked Mrs. Billington whether her husband was there. Upon being told that he was resting, Foster stated that he "had a proposition he wanted to put before him." Billington went to town later in the day, and Baca introduced Dillard to him. Dillard stated that he "had a proposition that would make money, but couldn't tell him, had to show him." The two made an appointment to meet at a hotel within an hour. Upon meeting there, Dillard locked the door, opened a leather bag, produced certain paraphernalia, including chemicals, pans, and a roller. He thereupon pretended that through the chemical and rolling process he changed a $1 bill into one of $5 denomination. He then stated that they could make money, suggested that Billington furnish $2500 for use in producing replicas, and that they would divide the profit. It was agreed that they would meet at El Fidel Hotel in Albuquerque the following day. Billington went, but failed to meet Dillard. Dillard went to Belen alone the next day, using the same automobile which Foster had driven the day he went to the Billington home. Dillard and Billington discussed the matter on the porch of the Billington residence at which it was agreed that the latter would go to Albuquerque Friday and that they would meet at El Fidel Hotel. Billington went and found appellants together there. Foster left presently. Dillard and Billington then discussed the matter in the lobby of the hotel. Dillard desired to show Billington how to make the counterfeit money, but was unwilling to do so in the hotel because it would cause a smell in the room. He suggested that they go elsewhere and proposed a camp. It was agreed that they would meet at the camp at 12:30 o'clock. When Billington reached the agreed place he found Dillard driving up and down the street. Dillard then stopped at a camp and rented a cabin. They entered it, drew the curtains, and again Dillard pretended to make counterfeit money in the same way. He then delivered the two notes described in the indictment to Billington. Billington compared the numbers, and they appeared to be identical. He

believed Dillard had made the replica through the chemical and rolling method, but in fact the changes had been made through the scratch process, that is, scratching the ink with a sharp instrument and then inserting the new number or letter. Billington stated that he desired to see if the bills would pass at a bank, paid Dillard $10 for them, and left with the understanding that he would obtain all the money possible; that they would return in the afternoon and enter the business of making counterfeit money. In going to the camp Dillard used an automobile which Foster had rented for the day. While Dillard and Billington were in the cabin Foster and Arias passed, looked at the automobile standing by the cabin, and then they parked nearby. They left promptly upon discovering officers shadowing the cabin. Appellants were together at the Combs Hotel in Albuquerque on one occasion a day or two after the first trip to Belen, and they went to the Arias' place together on the day of the events transpiring at the camp.

That the facts support the verdict against Dillard cannot be seriously challenged. He had the altered notes in his possession and delivered them to Billington as a part of the scheme to induce him to furnish a large sum of money; $2500 being suggested. The manifest purpose was to abscond with the money thus furnished and thereby defraud Billington. The evidence against Foster is circumstantial. He went with Dillard to Belen. That was the home of Billington. Soon after arriving there he told Baca that he desired to meet Billington. He went to Billington's residence, gave a fictitious name, inquired for Billington, and stated that "he had a proposition to put before him." Immediately upon meeting Billington soon afterwards, Dillard stated that he had a proposition that would make money. The language used by the two was strikingly similar. When Dillard went to Belen the second time he drove the same automobile which Foster had driven on the first trip. Foster was with Dillard at the hotel in Albuquerque when Billington arrived to fulfill his appointment with the latter. Foster went with Dillard to the Arias place later that day. He rented the car which Dillard used in going to the camp for the purpose of furthering the scheme. He significantly appeared in that vicinity while Dillard and Billington were in the cabin. He saw the rented car there. He then parked nearby, manifestly to watch developments, and left promptly upon discovering the officers shad-

owing the cabin. These circumstances and the reasonable inferences to be drawn from them are not only sufficient to support a finding under proper instructions that the two were acting together, but the record presents a clear picture of Foster being the directing genius behind the plan with Dillard forward in order to protect Foster from punishment. If leaders in crime are to be convicted it sometimes must be done upon circumstantial evidence. But if Foster merely aided and abetted Dillard he became a principal. 18 USCA § 550.

The judgment is affirmed.