REVISED OCTOBER 1, 2008
IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 16, 2008

Charles R. Fulbruge III
Clerk

No. 07-11005

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

CRYSTAL PORTER

Defendant-Appellant

Appeal from the United States District Court
for the Northern District of Texas, Dallas Division

Before SMITH, WIENER, and HAYNES, Circuit Judges.

WIENER, Circuit Judge:

Defendant-Appellant Crystal Porter was convicted by a jury under the generic conspiracy provisions of 18 U.S.C. § 371 (2000) for conspiring with others to make counterfeit obligations of the United States in violation of 18 U.S.C. § 471 and to pass such obligations in violation of 18 U.S.C. § 472.[1] On appeal, Porter asserts two grounds for vacating her conviction: (1) The evidence adduced

---

[1] Neither Porter nor any of her co-conspirators were charged with violating or conspiring to violate 18 U.S.C. § 473, which differs from the object crimes under §§ 471 and 472 by criminalizing the acquisition or delivery of counterfeit obligations "with the intent that the same be passed, published, or used as true and genuine" (emphasis added).

by the government was insufficient to support her conviction, and (2) the district court improperly instructed the jury on the meaning of "counterfeit." We affirm.

## I. BACKGROUND

In the fall of 2005, Joey Barrett met a drug dealer named Carlos, also known as Cecilio, who supplied Barrett with $300 worth of methamphetamine. When Barrett was unable to pay for the drugs, Carlos began threatening Barrett, his common-law wife Erica Horton, and their children. To make the threats stop, Barrett and Horton agreed that Carlos could use Horton's combination photocopier/scanner/fax machine to make fake money as a way to pay off the drug debt.

Over a two-day period, Carlos and Horton made the bogus money at the residence shared by Barrett and Horton. First, Carlos color-photocopied each side of a genuine $100 bill onto manila paper, cut out the photocopied images, glued the opposing sides together, and crumpled the finished product. Horton then drew lines on the fake $100 bills to replicate the magnetic strips found on genuine $100 bills.

When Carlos asked Horton if she could pass the bills, she replied that she knew a Wal-Mart cashier named Crystal Porter, who might help. Later, when Porter came to the home with Horton's cousin, Horton showed Porter the phony bucks and asked if she would accept them at her cash register as payment for $500 worth of Wal-Mart gift certificates. Porter looked at the fake money and said, "Yeah, this will work."

The next day, Horton went through Porter's checkout line at Wal-Mart and bought $300 worth of gift certificates using the bogus $100 bills that she and Carlos had made. Barrett also went through Porter's checkout line and bought $200 worth of gift cards using more of the fake bills.

Wal-Mart's cash office discovered the fake bills, traced them back to Porter's cash register, then contacted the Seagoville (Texas) Police Department.

Two days later, the police went to Porter's home; she answered the door and eventually told the police she was willing to cooperate. Porter admitted to the police that she had agreed to let Horton buy the Wal-Mart gift cards with the fake bills, and that when Horton and Barrett came through her checkout line the following day, she had accepted the bills despite knowing that they were not genuine.

Porter was indicted, tried, and convicted under 18 U.S.C. § 371 for conspiring with others to commit the object crimes of manufacturing and uttering counterfeit obligations of the United States in violation of 18 U.S.C. §§ 471 and 472. She was not charged with or tried for actually committing these or any other object crimes.

At the close of the government's case-in-chief, Porter moved for acquittal, contending that the instrument that she specifically agreed to assist in passing did not sufficiently resemble genuine currency to be counterfeit, thus making it legally impossible for her to have conspired to manufacture and utter counterfeit obligations. The court denied Porter's motion, stating that a "conspiracy offense is complete once the agreement is made and an overt act is committed by one or more of the co-conspirators during the existence of the conspiracy, whether or not the object crime is ever accomplished."

When the time came for the district court to instruct the jury, Porter requested that the district court use the following definition of counterfeit:

> A bill is counterfeit only if it possesses similitude: it bears such a likeness or resemblance to genuine currency as is calculated to deceive an honest, sensible and unsuspecting person of ordinary observation and care when dealing with a person supposed to be upright and honest.

In rejecting Porter's proposed instruction, the court expressed concern for "focusing the jury's attention too much on the definition of counterfeit, because this is really a conspiracy case, not a counterfeiting case," and reiterated that

3

"there never need [sic] to be a completed object crime in order for you to have a completed conspiracy." After the government's closing argument, Porter again urged the court to expand on the definition of counterfeit for the jury's benefit, but the court again declined to do so.

Following closing arguments, the district court instructed the jury as follows:

> The elements of the conduct prohibited by Section 471 are as follows:
>
> First: That a person made counterfeit Federal Reserve notes; and
>
> Second: That that person did so with intent to defraud, that is, intending to cheat someone by making the other person think that the Federal Reserve notes were real.
>
> . . .
>
> The elements of the conduct prohibited by Section 472 are as follows:
>
> First: That a person passed or uttered counterfeit Federal Reserve notes;
>
> Second: That that person knew, at the time, that the Federal Reserve notes were counterfeit; and
>
> Third: That that person passed or uttered the counterfeit Federal Reserve notes with intent to defraud, that is, with the intent to cheat someone by making that person think the Federal Reserve notes were real.
>
> . . .
>
> To be counterfeit, a Federal Reserve note must have a likeness or resemblance to genuine currency.

The district court derived this definition of "counterfeit" from the Fifth Circuit Pattern Jury Instructions for §§ 471 and 472, the notes of which are nearly identical. The note for the § 471 instruction states in relevant part:

> If there is an issue as to whether the money involved is so unlike the genuine that it may not be "counterfeit," the court should consider defining "counterfeit." The relevant Ninth Circuit pattern

4

instruction states "[t]o be counterfeit, a bill must have a likeness or resemblance to genuine currency."  Ninth Circuit Criminal Jury Instruction No. 8.22.

Apparently no Fifth Circuit case has defined "counterfeit" for purposes of § 471 [or § 472].  With respect to 18 U.S.C. § 473 (dealing in counterfeit obligations or securities), the Fifth Circuit has defined counterfeit as follows:

A document is considered a counterfeit obligation or security of the United States if the fraudulent obligation bears such a likeness or resemblance to any of the genuine obligations of the United States as is <u>calculated to deceive an honest, sensible, and unsuspecting person of ordinary observation and care dealing with a person who is supposed to be upright and honest</u>.  United States v. Scott, 159 F.3d 916, 920-21 (5th Cir. 1998).[2]

Porter reiterated her objection to the district court's definition of "counterfeit," but her objection was again overruled.   After the jury convicted Porter, she timely filed a notice of appeal.

## II.  ANALYSIS

### A.  Sufficiency of the Evidence

Porter contends on appeal that the evidence is insufficient to support her conspiracy conviction for two reasons: (1) The conspiracy to make and pass the fake money was completed before she formed an intent to commit a crime; and (2) as the fakes were not sufficiently similar to genuine bills, they were not "counterfeit," so she could not have joined a conspiracy to make and pass counterfeit money.   The government counters that (1) Porter joined the conspiracy in Horton's home, before the conspiracy was completed, so that whether the fake money qualifies as counterfeit is irrelevant, and (2) the evidence at trial established all elements of a conspiracy beyond a reasonable doubt.

---

[2] Fifth Circuit Pattern Jury Instruction (Criminal) § 2.24 (2001) (emphasis added).

We review Porter's claim of insufficient evidence "to determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" United States v. Infante, 404 F.3d 376, 384 (5th Cir. 2005) (quoting United States v. Bellew, 369 F.3d 450, 452 (5th Cir. 2004)). "[W]e must 'accept all reasonable inferences [that] tend to support the jury's verdict.'" Id. (quoting United States v. McDow, 27 F.3d 132, 135 (5th Cir. 1994)). "'The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, and the jury is free to choose among reasonable constructions of the evidence.'" Id. at 384-85 (quoting United States v. Dadi, 235 F.3d 945-50 (5th Cir. 2000)).

The crime of conspiracy is "separate and distinct from" the crime that is the object of the conspiracy. United States v. Cantu, 557 F.2d 1173, 1176-77 (5th Cir. 1977). To support a conspiracy conviction under § 371, the government must prove three elements: (1) an agreement between two or more people to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the conspirators in furtherance of the conspiracy's objective. 18 U.S.C. § 371; see, e.g., United States v. Williams, 507 F.3d 905, 910 n.4 (5th Cir. 2007), cert. denied, 128 S. Ct. 2074 (2008).

Porter correctly asserts that the government was required to prove that she entered into an agreement to pass counterfeit money, emphasizing that one witness described the fake bills in question as "Monopoly money." If the only evidence presented had been that Porter agreed to accept bills that looked like "Monopoly money," we would agree that the evidence was insufficient to support her conviction, but that simply is not the case.

First, the evidence showed that Horton, Barrett, and Carlos agreed to make fake $100 bills using Horton's photocopier, which created identical color

6

reproductions of genuine $100 bills, and to use such phony bucks to purchase Wal-Mart gift cards. Second, Horton testified that Porter viewed the bogus $100 bills and expressly agreed to allow one or more of her co-conspirators to use them in the future to buy Wal-Mart gift cards at Porter's Wal-Mart cash register. Third, the trial court admitted the ersatz $100 bills manufactured by Carlos and Horton into evidence. Even though Porter insisted that, to the touch, the fake bills felt nothing like the actual Federal Reserve Notes of which they were photostatic copies, the jury found otherwise; and it is the function of the jury to weigh competing evidence.

We are satisfied that the bills themselves constitute evidence from which a rational jury, properly instructed, could have found beyond a reasonable doubt that, while she was at the Barrett/Horton home on the day before she participated in the actual passing of the bogus instruments at the Wal-Mart where she worked, Porter affirmatively joined the ongoing conspiracy to make counterfeit obligations and thereafter to pass them. The evidence also demonstrates that there were multiple overt acts in furtherance of the conspiracy's objective, including the manufacturing of the fake bills and the enlisting of Porter to accept them, well before Porter actually accepted those instruments from Horton and Barrett at her Wal-Mart cash register.[3] We hold that the evidence was sufficient to support Porter's conviction under § 371 for conspiring with others to violate §§ 471 and 472.

## B. Jury Instruction

Porter further contends that the district court abused its discretion when it refused to use her proposed definition of "counterfeit" in charging the jury.

---

[3] Porter is responsible for overt acts completed before she joined the conspiracy. United States v. Barksdale-Contreras, 972 F.2d 111, 114 (5th Cir. 1992) ("[I]t is settled law . . . that one who joins an ongoing conspiracy is deemed to have adopted the prior acts and declarations of conspirators, made after the formation and in furtherance of the conspiracy." (internal quotation marks omitted)).

Porter asserted at trial that, because she agreed to accept fake $100 bills at her cash register that were so unlike the genuine article as to be incapable of deceiving an honest, sensible, and unsuspecting person, the copies that she eventually accepted were not, by definition, "counterfeit." Thus, Porter contends that, even though she conspired to pass fake $100 bills, she did not conspire to pass counterfeit $100 bills. In essence, she argues that, by refusing to instruct the jury using her definition of counterfeit, the trial court denied her the opportunity to present her main defense to the jury. The government counters that (1) the similitude of the money is irrelevant to the charged crime of conspiracy to violate §§ 471 and 472, and (2) such similitude was not an issue in Porter's case and therefore required no more detailed instruction to the jury than the one given by the court.

We review a district court's denial of a proffered jury instruction for abuse of discretion. District courts enjoy substantial latitude in formulating jury instructions.[4] A district court abuses its discretion in denying a requested instruction only if such instruction (1) is a substantively correct statement of the law, (2) is not substantially covered in the charge as a whole, and (3) concerned an important point in the trial such that the failure to instruct the jury on the issue seriously impaired the defendant's ability to present a given defense.[5] If the instruction sought fails to meet any one of these three conjunctive elements of the Jobe test, the trial judge acts within his discretion in declining to accept that jury instruction. When, for purposes of today's inquiry, we first examine the second Jobe element, i.e., whether the proffered instruction was substantially covered in the given charge as a whole, we conclude that it was and end our inquiry at this point.

---

[4] United States v. Jobe, 101 F.3d 1046, 1059 (5th Cir. 1996).

[5] Id.

Porter contends that the district court's instruction failed adequately to define "counterfeit." As noted, the court instructed the jury that "[t]o be 'counterfeit,' the Federal Reserve Note must have a likeness or resemblance to genuine currency." Porter's proffered instruction defines counterfeit obligations as bills that "bear such a likeness or resemblance to genuine currency as is calculated to deceive an honest, sensible, and unsuspecting person of ordinary observation and care dealing with a person who is supposed to be upright and honest." As shall be seen, a comparison of the differences between the court's instruction and the one proffered by Porter demonstrates the distinguishing differences between, on the one hand, the object crimes under §§ 471 and 472, which Porter was convicted of conspiring to violate, and, on the other hand, the object crime under § 473, under which she was never charged.

The district court was without explicit guidance in choosing how to instruct the jury on the meaning of counterfeit under the facts of this case. Although our jurisprudence has defined "counterfeit" for the purposes of § 473, it has not done so for §§ 471 and 472, the object crimes on which Porter's conspiracy charge was based. This dichotomy is reflected in the Fifth Circuit Pattern Jury Instructions, which both (1) reiterate the language of our § 473 jurisprudence defining counterfeit for purposes of that section, and (2) incorporate by reference the Ninth Circuit Pattern Jury Instruction as derived from that circuit's case law defining counterfeit for purposes of §§ 471 and 472.[6] We observe, therefore, that because the object crimes underlying Porter's conspiracy charge relate to §§ 471 and 472, for which no original instructions defining "counterfeit" are found in our cases or in this circuit's Pattern Jury Instructions, the district court understandably chose to use the Ninth Circuit's definition of counterfeit for purposes of §§ 471 and 472, which is incorporated by

---

[6] Fifth Circuit Pattern Jury Instruction (Criminal) §§ 2.24 and 2.25.

reference in the Pattern Jury Instructions of this circuit. The Ninth Circuit provision is directly applicable to §§ 471 and 472, but the only Fifth Circuit pattern definition of counterfeit that comes directly from our case law is specifically applicable only to § 473. The district court chose the referentially incorporated Ninth Circuit definition of counterfeit and declined to use the definition of counterfeit from either our case law or Porter's proffered instruction, both of which define counterfeit in the context of § 473, which is not at issue here.

The propriety of the trial court's exercise of its discretion becomes apparent when viewed in the light of the differences between §§ 471 and 472 on the one hand and § 473 on the other. Section 471 criminalizes only the making, forging, counterfeiting or altering United States obligations or securities, and § 472 criminalizes only the passing, uttering, publishing, and selling, or the possessing or concealing, of such false obligations. In contrast, § 473 requires not only that the perpetrator acquire or dispose of such false obligations but that he do so with the specific intent that they be perceived "as true and genuine."[7] The difference between the intent required to violate § 473 and that required to violate §§ 471 and 472 is mirrored in the difference between the required level of similarity of the bogus bills to the genuine ones for the different object crimes. Merely to defraud by making or passing copies of an obligation of the United States does not require a particularly high level or degree of similitude. In stark contrast, to pass, publish, or use false obligations with the level of intent required under § 473, viz., the specific intent that they be perceived by the recipient "as true and genuine," requires that the phony bills have a substantially greater level or degree of similitude to the genuine article.

---

[7] 18 U.S.C. § 473 (2000).

If Porter had been charged with conspiring to violate § 473, her proffered charge, like the Fifth Circuit Pattern Jury Instruction for that specific section, might well have been necessary. As the object crimes underlying Porter's conspiracy are those covered by §§ 471 and 472, however, instructing the jury with the definition of counterfeit derived from the Ninth Circuit's pattern instructions and incorporated by reference by this circuit's pattern jury charges came well within the discretion of the trial court here.

As noted, if any one of the three conjunctive Jobe elements is not present, a trial court would be within its discretion in denying a proffered jury instruction.[8] We determined above that, because the object crimes for Porter's conspiracy were those enumerated in §§ 471 and 472, the district court sufficiently defined "counterfeit" in the instruction that it gave to the jury. It follows that the district court was equally within its discretion in declining to adopt Porter's proffered language. This would be so even if we were to assume arguendo that hers was a correct statement of law and that it concerned an important trial point of which the failure to instruct the jury could seriously impair their defense. As the substance of Porter's proffered instruction was substantially covered by the trial court's charge on the meaning of counterfeit, the other two prongs of the Jobe test are inapt and, thus, need not be addressed.

## III. CONCLUSION

We are satisfied that the evidence was sufficient to support Porter's § 371 conviction for conspiring to violate §§ 471 and 472, and that the charge actually given to the jury, drawn as it was from the Fifth Circuit Pattern Jury Instructions for the object crimes underlying Porter's conspiracy charge, substantially and sufficiently covered the meaning of the term "counterfeit" and

---

[8] United States v. Jobe, 101 F.3d at 1059.

thus did not constitute an abuse of discretion by the district court. Accordingly,

Porter's conviction is

AFFIRMED.

HAYNES, Circuit Judge, concurring in part and dissenting in part.

I generally concur in the majority's opinion with one exception. I agree with the majority's conclusion that the evidence supports a finding that Porter completed the crime of conspiracy at the Horton home, well before and independent of the events that occurred at Wal-Mart. For the reasons set forth below, I respectfully dissent from the portion of the majority's opinion affirming the district court's jury instruction on the definition of "counterfeit."

The majority correctly notes that the essence of a conspiracy is the agreement. This conclusion, however, begs the question of "an agreement to do what?" Porter had to agree to pass counterfeit bills, not just to commit simple theft.[1] Porter argued at trial that because she agreed to accept at her cash register $100 bills incapable of deceiving an honest, sensible, and unsuspecting person, the bills were not by definition "counterfeit." Thus, according to her, even though Porter conspired to pass fake $100 bills, she did not conspire to pass counterfeit bills. By refusing to instruct the jury using Porter's definition of counterfeit, Porter argues that the district court denied her the opportunity to present her main defense to the jury. The Government argues that the similitude of the money is irrelevant to the crime of conspiracy, was not an issue in Porter's case, and therefore required no more instruction to the jury than what was given.

The majority opinion correctly states the standard of review for jury instructions. A district court abuses its discretion in denying a requested instruction if the instruction: (1) was a substantively correct statement of the law, (2) was not substantially covered in the charge as a whole, and (3) concerned an important point in the trial such that the failure to instruct the

---

[1] This distinction is important because not every crime involving money is a federal crime. Undoubtedly, Porter conspired to commit theft, but that charge belongs in state, not federal, court.

jury on the issue seriously impaired the defendant's ability to present a given defense.  United States v. Jobe, 101 F.3d 1046, 1059 (5th Cir. 1996).  However, a judge has no discretion in determining the law, so whether the jury was properly instructed is a question of law this court reviews de novo.  See United States v. Guidry, 406 F.3d 314, 321 (5th Cir. 2005).

 1.  Porter's proffered instruction was a correct statement of the law.

  In United States v. Scott, 159 F.3d 916 (5th Cir. 1998), this court held that a note is counterfeit if it

> bears such a likeness or resemblance to any of the genuine obligations or securities issued under the authority of the United States as is calculated to deceive an honest, sensible and unsuspecting person of ordinary observation and care dealing with a person who is supposed to be upright and honest.

Scott, 159 F.3d at 920-21.  Porter's proffered instruction mirrored this court's definition of "counterfeit obligation" in Scott.  See id.  As the Government points out on appeal, Scott defined "counterfeit" for purposes of 18 U.S.C. § 473 (2001), which criminalizes the transfer of counterfeit obligations or securities.  The Government gives no reason for defining the word "counterfeit" differently in section 473 than in the almost identical sections at issue here – sections 471 and 472.  The majority, however, does attempt to explain why Scott's definition of "counterfeit" is exclusively applicable to section 473:

> The difference between the intent required to violate § 473 and that required to violate §§ 471 and 472 is mirrored in the difference between the required level of similarity of the bogus bills to the genuine ones for the different object crimes. . . . [T]o pass, publish, or use false obligations with the level of intent required under § 473,

viz., the specific intent that they be perceived by the recipient "as true and genuine," requires that the phony bills have a substantially greater level or degree of similitude to the genuine article.

Thus, the majority suggests that the three sections' different intent requirements justify the district court's use of a "counterfeit" definition other than the one articulated by this court in Scott.

The majority's distinction is problematic in two respects. First, section 473 requires an intent to pass false obligations as "true and genuine," whereas sections 471 and 472 require "an intent to defraud." This slight difference in the intent requirement might necessitate a different instruction on intent,[2] but it does not change the meaning of the word "counterfeit."[3]

Second, the majority cites no opinion, in this circuit or any other, which states that the definition of "counterfeit" is different among sections 471, 472, and 473. This court in Scott, when defining "counterfeit" for purposes of section 473, cited a case which in turn relied on a Fourth Circuit case defining "counterfeit" for purposes of section 472, one of the very sections at issue here. Scott, 159 F.3d at 920-21 (citing United States v. Turner, 586 F.2d 395, 397 (5th Cir. 1978)(citing United States v. Smith, 318 F.3d 94, 95 (4th Cir. 1963))). Not even the Fifth Circuit Pattern Jury Instructions, upon which the majority relies to find that the district judge did not abuse his discretion, purport to limit Scott's definition of "counterfeit" to jury instructions only pertaining to section 473. Instead, they explicitly suggest using Scott's definition for jury instructions

---

[2] Intent focuses on the defendant's subjective mental state. Whether a fake bill could actually deceive an unsuspecting, honest person, on the other hand, is an objective inquiry.

[3] It is worth noting that the district judge never purported to base his ruling on the different intent requirements articulated by sections 471, 472, and 473.

15

pertaining to either section 471 or 472.[4]  Indeed, the majority's distinction puts our circuit at odds with our sister circuits that have defined "counterfeit" for purposes of sections 471 and 472 just as our court defined the term in Scott.[5]

In sum, to the extent that the majority contends Scott's definition of counterfeit exclusively applies to section 473, I respectfully disagree.

2.  Porter's proffered instruction was not substantially covered in the charge as a whole.

The majority holds that the proffered instruction was substantially covered in the given charge.  Simply by looking at the given instruction on the general meaning of "counterfeit" and the rest of the charge as a whole, it is clear that Porter's proffered instruction was not substantially covered.  Porter's instruction articulated a specific standard under which the jury could determine if the fake bills contemplated to be used by the alleged conspirators appeared sufficiently genuine to be counterfeit.  Specifically, Porter's instruction would have limited counterfeit obligations to include only those bills so similar to

---

[4] The Fifth Circuit Pattern Jury Instructions also reference the Ninth Circuit Pattern Jury Instructions which are the source of the "likeness" language used by the district court. Pattern jury instructions are not law, and the Ninth Circuit pattern instructions cite no law in support of the "likeness" language. See United States v. Williams, 20 F.3d 125, 132 (5th Cir. 1994) (providing that while the Pattern Jury Instructions provide a useful guide for the district courts, they are not law).  Even the Ninth Circuit itself uses Porter's definition, not the one suggested by the Ninth Circuit Pattern Jury Instructions.  United States v. Johnson, 434 F.2d 827, 829 (9th Cir. 1970).  Interestingly, neither the Fifth nor the Ninth Circuit's Pattern Jury Instructions suggest that section 473 should be handled differently from sections 471 and 472. The only implication to be derived from the Fifth Circuit Pattern Jury Instructions is that its authors thought that section 473 was sufficiently similar to serve as a blueprint for defining "counterfeit" in jury instructions pertaining to sections 471 and 472.

[5] See, e.g., United States v. Mousli, 511 F.3d 7, 15 (1st Cir. 2007); United States v. Taftsiou, 144 F.3d 287, 291 (3d Cir. 1998); United States v. Wethington, 141 F.3d 284, 287 (6th Cir. 1998); United States v. Ross, 844 F.2d 187, 189 (4th Cir. 1988); United States v. Cantwell, 806 F.2d 1463, 1471 (10th Cir. 1986); United States v. Hall, 801 F.2d 356, 357-58 (8th Cir. 1986); United States v. Brunson, 657 F.2d 110, 114 (7th Cir. 1981); United States v. Johnson, 434 F.2d 827, 829 (9th Cir. 1970).

genuine currency as to deceive an honest, sensible and unsuspecting person.[6] But the district court instructed the jury that to be counterfeit, a Federal Reserve note must simply have a likeness or resemblance to genuine currency.[7] Neither the district court's definition nor any other portion of its jury charge instructed the jury to what degree, if any, the fake bills had to resemble real money.

3. Porter's proffered instruction concerned an important point in the trial such that the district court's denial seriously impaired Porter's ability to present her defense.

The very experienced and capable district judge in this case intentionally limited the amount of attention the jury charge gave to the object crimes' counterfeit elements so that the jury would remain focused on the sole conspiracy charge that was the subject of Porter's trial. But he nonetheless chose to provide an explanation of the term "counterfeit." The problem here is that the district court's instruction overlooked an important distinction. Because Porter was tried only for conspiracy, the Government argues that an instruction correctly defining the word "counterfeit" did not concern an important point of the trial, and nothing more than a general description of the term was required.

Yet the essence of a conspiracy is the agreement to commit a particular crime. United States v. Jimenez Recio, 537 U.S. 270, 274 (2003); see also United States v. Binetti, 552 F.2d 1141, 1142 (5th Cir. 1977) (reversing a defendant's conviction for conspiracy to posses and distribute cocaine when the defendant did

---

[6] Porter's requested instruction stated:

A bill is counterfeit only if it possesses similitude: it bears such a likeness or resemblance to genuine currency as is calculated to deceive an honest, sensible and unsuspecting person of ordinary observation and care when dealing with a person supposed to be upright and honest.

[7] The pertinent portion of the jury charge stated only: "To be counterfeit, a Federal Reserve note must have a likeness or resemblance to genuine currency."

not conspire to sell cocaine, but rather a harmless, lawful substance that looked like cocaine). It is part of the Government's burden to prove that "'the intended future conduct [the conspirators] agreed upon includes all the elements of the substantive crime.'" United States v. Pinckney, 85 F.3d 4, 8 (2d Cir. 1996) (quoting United States v. Rose, 590 F.2d 232, 235 (7th Cir. 1978)); see also United States v. Foote, 413 F.3d 1240, 1250 (10th Cir. 2005); United States v. Warshawsky, 20 F.3d 204, 209 (6th Cir. 1994); United States v. Vaglica, 720 F.2d 388, 391 (5th Cir. 1983) (explaining that while failure to instruct on the substantive elements of the object crimes is not always plain error, such an omission by the trial court does constitute a serious error when a defendant raises a question as to the elements of the substantive crime that was the object of the conspiracy).

In 99 out of 100 cases, the distinction between the "likeness" definition given and the "calculated to deceive an honest person" definition requested and refused, would be a distinction without a difference. Here it is not. Erica Horton testified on cross-examination to a day-by-day breakdown of the conspiracy. She explained that on Day 1, Carlos came to her home and made the fake $20 bills. On Day 2, Carlos came to her house and made the fake $100 bills, finished and left. After he left, Porter came over, Horton showed her the finished $100 bill, and Porter said "Yeah, this will work." This is the evidence suggesting Porter agreed to pass a specific fake bill, one that she had seen, one that she was familiar with, and one that either did or did not meet the definition of "counterfeit." Consequently, whether this specific fake bill (either itself or as an exemplar of the fake bills intended to be used) was counterfeit is relevant as to whether Porter conspired to pass a counterfeit bill. These bills were color copies of the front and back of actual bills; they undoubtedly had a "resemblance" to real money. But arguably they did not feel like real money and were, therefore, not sufficiently real to deceive someone.

Even with Porter's proffered jury instruction, a reasonable jury could still find that she conspired to pass counterfeit money, which is why I concur in the conclusion that sufficient evidence supported a verdict of guilty. But with Porter's jury instruction, a reasonable jury could also find to the contrary – that the specific bills she agreed to pass were not sufficiently real to qualify as counterfeit. At the very least, the jury could have a reasonable doubt. For this reason, the district court should have given Porter's proffered instruction, and its failure to do so seriously impaired her ability to present her defense to the jury.

Accordingly, I respectfully dissent as to the portion of the majority's opinion finding that the district court's jury charge defining the term "counterfeit" did not constitute an abuse of discretion by the district court. I would reverse and remand for a new trial.