# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
March 5, 2012

No. 10-31188

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

JACKSON NTONE NDEMBA, also known as Ndemba Ntone Jackson, also known as Sammy Jackson; PIERRE EMMANUEL JALLA, also known as Marco Jalla,

Defendants - Appellants

Appeals from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:09-CR-228-2

Before KING, BENAVIDES, and DENNIS, Circuit Judges.

PER CURIAM:[*]

Defendants–Appellants Jackson Ntone Ndemba and Pierre Emmanuel Jalla were convicted of conspiracy to manufacture counterfeit United States currency in violation of 18 U.S.C. §§ 471 and 371, and manufacturing counterfeit United States currency in violation of 18 U.S.C. §§ 471 and 2. Defendants timely appealed, arguing that their convictions were not supported by sufficient

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-31188

evidence.    For the reasons stated below, we AFFIRM the judgments of conviction.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case involves a scheme to steal $60,000. Defendant–Appellant Pierre Emmanuel Jalla ("Jalla") testified at length about the details of the scheme at trial and demonstrated the steps of the scheme to FBI agents in the Government's Exhibit 23, a video that was made shortly after Jalla's arrest and was played for the jury at trial. An audiotape of Jalla's description of the scheme to undercover officer Adele Robert Saman ("Saman") was also played at trial.

To conduct the scheme, Jalla needed to find a victim who would provide $60,000 in actual United States currency that would purportedly be used to make $120,000 in counterfeit currency. Jalla would make an agreement with the victim that Jalla would keep $60,000 of the counterfeit currency made, and the victim would receive the other $60,000 of counterfeit currency, as well as the $60,000 in actual currency. The victim would come to a hotel room to participate in the making of counterfeit $100 bills. Jalla and the victim would work in low light, and Jalla would use latex gloves, masks, and chemicals (baby powder, green alcohol, and iodine) in order to make the counterfeiting operation seem believable to the victim. During the process, Jalla would have the victim bring the actual currency into the bathroom so it could be heated in warm water in the bathtub.   The heating process was purportedly necessary to facilitate the transfer of color from the genuine currency to pieces of white paper cut to the size of dollar bills. Jalla would then tell the victim that he forgot his syringe and would send the victim out of the room to retrieve it.   While the victim was out, Jalla would replace the victim's actual currency with fake currency that Jalla had secretly brought into the bathroom. Jalla and the victim would then take the counterfeit currency, which the victim believed was the actual currency, out of the bathtub and put sheets of white paper on either side of these fake bills.

2

No. 10-31188

This was purportedly a step in making the sheets of white paper into counterfeit currency. Jalla then would divide the currency and paper into three stacks and soak each stack in iodine. Finally, Jalla would inject the stacks with green alcohol and would send the victim home with all three stacks. Jalla and the victim would agree to meet the following day so that Jalla could apply a special cleaning fluid to the bills to complete the counterfeiting process. However, Jalla would not meet the victim the next day, but would instead leave with the $60,000 in actual currency he had secretly taken. At the end of the scheme, the victim would be left with worthless black paper.

Jalla traveled from Atlanta to New Orleans with the intention of finding a victim for his scheme. Defendant–Appellant Jackson Ntone Ndemba ("Ndemba") was Jalla's driver during the trip. Jalla testified that Ndemba was unaware of his scheme and merely wanted to visit New Orleans as a tourist. On this trip, Jalla encountered a man known as "Nick," who was purportedly interested in participating in the scheme, and Jalla demonstrated his counterfeiting technique to him. During the final steps of the demonstration, Jalla switched the fake currency he was making with genuine currency and pretended that the real currency was the end product of his counterfeiting process. "Nick," who was actually a confidential informant, eventually introduced Jalla to a man known as "Jimmy," who was purportedly interested in providing the $60,000 Jalla said he needed to make $120,000 in counterfeit bills. Jalla demonstrated his counterfeiting technique to both "Nick" and "Jimmy." On July 23, 2009, Jalla agreed with "Nick" and "Jimmy" that, on July 27, 2009, "Jimmy" would provide $60,000 in actual currency and would rent a hotel room where they would manufacture $120,000 in counterfeit currency. Subsequently, Ndemba drove Jalla back to Atlanta, where, according to Jalla's testimony, Jalla worked alone to prepare for his scheme by gathering materials and printing counterfeit bills.

3

No. 10-31188

When Jalla and Ndemba returned to New Orleans, Jalla dealt with a man known to him as "Ahamed," who was purportedly Jimmy's older brother. "Ahamed" was actually Saman, the undercover officer whose phone conversation with Jalla is mentioned above. Jalla and Ndemba met with "Ahamed" in an Office Depot parking lot on July 29, 2009, where "Ahamed" gave them a key to the hotel room that was to be the site of the counterfeiting operation. Ndemba drove Jalla from the Office Depot parking lot to the hotel where the counterfeiting was to occur, which is where Ndemba and Jalla were both arrested.

As noted above, Jalla cooperated with FBI agents and demonstrated his scheme to them shortly after his arrest. In addition, before meeting with "Ahamed" at Office Depot, Jalla had rented a hotel room nearby where he had stored his supplies. Agents searched that hotel room and found, *inter alia*, stacks of paper cut to the size of United States currency, large stacks of counterfeit currency, a hospital mask, a syringe, two pieces of white paper that each bore the image of a $20 bill in white ink, two actual $100 bills with serial numbers that matched the serial numbers on many of the counterfeit bills, and bottles of chemicals wrapped in aluminum foil. Agents also searched a hotel room that Jalla had rented in Chamblee, Georgia, and found a printer and ink cartridges that Jalla testified he had used to make the counterfeit currency found in his hotel room near New Orleans.

Jalla and Ndemba (collectively, "Defendants") were initially charged with conspiracy to commit mail fraud and wire fraud in violation of 18 U.S.C. §§ 1343 and 371, and mail and wire fraud in violation of 18 U.S.C. §§ 1343 and 2. A superseding indictment was brought against Defendants adding charges of conspiracy to manufacture counterfeit United States currency in violation of 18 U.S.C. §§ 471 and 371, and manufacturing counterfeit United States currency in violation of 18 U.S.C. §§ 471 and 2. A second superseding indictment charged

No. 10-31188

Defendants with conspiracy to manufacture counterfeit United States currency in violation of 18 U.S.C. §§ 471 and 371, and manufacturing counterfeit United States currency in violation of 18 U.S.C. §§ 471 and 2. A jury convicted Defendants of both counts of the second superseding indictment. Jalla was subsequently sentenced to 33 months' imprisonment, and Ndemba was sentenced to 18 months' imprisonment. Both Defendants now appeal, arguing that there was insufficient evidence presented at trial to support their convictions.

## II. DISCUSSION

*A. Standard of Review*

Because Defendants properly preserved their challenge to the sufficiency of the evidence supporting their convictions, we review "the evidence and all inferences to be drawn from it in the light most favorable to the verdict to determine if a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Seale*, 600 F.3d 473, 496 (5th Cir. 2010); *see also United States v. Villarreal*, 324 F.3d 319, 322 (5th Cir. 2003). "A jury is free to choose among reasonable constructions of the evidence." *United States v. Pigrum*, 922 F.2d 249, 254 (5th Cir. 1991). We also consider all credibility determinations in the light most favorable to the jury's verdict. *See United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996). Thus, our review is "highly deferential to the verdict." *United States v. Harris*, 293 F.3d 863, 869 (5th Cir. 2002).

*B. Jalla's Conviction for Manufacturing Counterfeit United States Currency*

Under 18 U.S.C. § 471, "[w]hoever, with intent to defraud, falsely makes, forges, counterfeits, or alters any obligation or other security of the United States, shall be fined under this title or imprisoned not more than 20 years, or both." Thus, to be convicted under § 471, a person must (1) make counterfeit United States currency and (2) do so with intent to defraud, meaning the intent

5

No. 10-31188

to cheat someone by making that person think the counterfeit currency was real. *See United States v. Porter*, 542 F.3d 1088, 1091 (5th Cir. 2008); Fifth Circuit Pattern Jury Instructions (Criminal) § 2.24. Under 18 U.S.C. § 2(a), one who aids or abets the commission of an offense, in this case making counterfeit obligations under § 471, is punishable as a principal.

In contesting his conviction, Jalla contends that he lacked the intent to defraud required to violate § 471. Jalla asserts that he "intended nothing more than to commit a theft" and did not intend to cheat his victim by making him believe the fake currency that he manufactured was genuine. He focuses on the fact that, at the end of his scheme, the counterfeit bills he had made and would have left in the victim's possession would be worthless pieces of paper blackened by iodine. This paper, Jalla argues, could never have been mistaken for genuine currency. Thus, Jalla contends that he could not have intended the counterfeit bills that he had manufactured to be mistaken for genuine currency, as required by § 471. Jalla also asserts that the fake currency he made would not fit within the definition of "counterfeit," because in its blackened form, it would lack a semblance to actual United States currency.

Jalla's arguments, however, are unavailing in light of his testimony and the details of his scheme. At trial, Jalla flatly responded, "Yes," when asked, "Did you make counterfeit money?" Further, Jalla testified that he planned to switch the victim's real currency for the fake currency Jalla had manufactured. Jalla then planned to use the fake currency in the purported counterfeiting process, which he would conduct in front of the victim. Consequently, it would have been essential that the victim continue to believe that the bills Jalla would handle were the genuine ones the victim had supplied. Jalla testified that, at this stage of the scheme, he would "put the light a little bit lower" so that the fake currency looked like genuine currency. Thus, it is clear that Jalla intended to deceive his victim and convince him that the counterfeit currency was, in fact,

actual currency. Jalla also testified that his aim was to "lead ['Ahamed'] to believe that it was counterfeit and real money he was going to walk out of that hotel room with." As a consequence, Jalla's testimony provided a sufficient basis for a reasonable jury to conclude that Jalla violated § 471 by making counterfeit obligations with the intent that his victim think the fake currency was genuine.[1]

Jalla contends on appeal that there is insufficient evidence that the currency made by Jalla was sufficiently similar to genuine currency to be considered "counterfeit." However, this court has stated that § 471 "does not require a particularly high level or degree of similitude" and that a jury instruction defining "counterfeit" as "hav[ing] a likeness or resemblance to genuine currency" "substantially and sufficiently covered the meaning of the term." *Porter*, 542 F.3d at 1091, 1094–95. As discussed above, Jalla flatly admitted that he made counterfeit money. Furthermore, the fake currency that Jalla made needed to look a great deal like genuine currency, or the victim of the scheme would notice that the actual currency he had provided was no longer being used in the counterfeiting process after Jalla had furtively replaced the real currency with the bills he had made beforehand. Thus, the evidence strongly suggests that the currency Jalla made fell within the definition of "counterfeit," at least at this critical stage in Jalla's scheme. In addition, the fake currency found in Jalla's hotel room near New Orleans alongside his counterfeiting supplies was admitted into evidence and was available for

---

[1] *Foster v. United States*, 76 F.2d 183 (10th Cir. 1935), dealt with a similar situation. In *Foster*, the defendants were convicted of altering currency with intent to defraud. *Id.* at 184. The defendants had altered the serial numbers of $5 bills so that the numbers would be identical and it would appear that defendants had manufactured this currency through their counterfeiting process. *Id.* The court stated that "[i]t is enough if an alteration is made in furtherance of a scheme to defraud . . . . An alteration made as a material part of a scheme to defraud any person comes within the terms of the statute [criminalizing alteration of an obligation of the United States with intent to defraud]." *Id.*; *see also Barnett v. United States*, 384 F.2d 848, 854–55 (5th Cir. 1967) (discussing *Foster* and noting that the *Foster* court was interpreting what is now § 471).

No. 10-31188

inspection by the jury. This provides further support for the conclusion that the bills made by Jalla sufficiently resembled real money to be considered "counterfeit" within the meaning of § 471.

Jalla stresses that the fake currency the victim would receive at the end of the scheme could never be put into circulation. He suggests that "Congress implicitly intended to criminalize manufacturing counterfeit money under 18 U.S.C. § 471 in order to prevent counterfeit money from being placed into circulation." However, § 471, by its terms, criminalizes "falsely mak[ing] . . . any obligation or other security of the United States." It "does not require or mention circulating . . . counterfeit notes." *United States v. Patterson*, 812 F.2d 1188, 1191 (9th Cir. 1987). Passing or dealing in counterfeit obligations is criminalized separately. *See* 18 U.S.C. §§ 472–73. Thus, whether the manufactured currency that Jalla's victim ultimately would possess was not in any condition for circulation has no bearing on the analysis of whether Jalla violated § 471.[2]

Jalla further asserts that his efforts to convince his victim that the money he made was genuine would have merely amounted to "puffing" about the quality of his goods. This court has stated that "non-actionable 'puffery' comes in at least two possible forms: (1) an exaggerated, blustering, and boasting statement upon which no reasonable buyer would be justified in relying; or (2) a general claim of superiority over comparable products that is so vague that it can be understood as nothing more than a mere expression of opinion." *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 497 (5th Cir. 2000). Making

---

[2] Similarly, Jalla contends that, under *United States v. Wolfe*, 307 F.2d 798 (7th Cir. 1962), "a defendant could only have intent to defraud if he knowingly passed counterfeit bills to a third party whom the defendant knew would spend the money." *Wolfe*, however, dealt with the conviction of a defendant for passing or uttering counterfeit obligations under § 472, an offense that required counterfeit bills to be circulated. *Id.* at 800. As discussed above, § 471 does not require circulation. Consequently, *Wolfe* is not relevant to our analysis.

counterfeit currency with the intent of covertly switching it with actual currency, however, involves far more than merely overstating the quality of the counterfeit currency Jalla had made. Thus, we reject Jalla's argument that his actions would have been mere puffing.

Finally, Jalla, whose native language is French, contends that he had difficulty understanding and answering the questions posed to him at trial, and thus that his testimony should not be considered sufficient to support his conviction. However, Jalla testified in English, and translators were available to assist Jalla throughout the trial. In addition, Saman, who had spoken with Jalla on the telephone and in person, testified that he had no trouble communicating with Jalla in English and that Jalla never indicated that he had trouble comprehending what Saman said. Thus, the purported language barrier affecting Jalla did not prevent his testimony from constituting sufficient evidence to support the jury's verdict. *Cf. Kap Lam Thang v. Holder*, 354 F. App'x 198, 200 (5th Cir. 2009) (rejecting petitioner's argument that his inability to understand English caused him to give inconsistent answers to questions).

*C. Defendants' Convictions for Conspiracy to Manufacture Counterfeit United States Currency*

In challenging his conviction under 18 U.S.C. §§ 371 and 471, Jalla adopted the arguments made by Ndemba on appeal. Thus, we examine Defendants' conspiracy convictions together. As noted above, Jalla and Ndemba were convicted of conspiring to manufacture counterfeit currency in violation of §§ 471 and 371. Conviction for conspiracy under § 371 requires the government to prove beyond a reasonable doubt that (1) there was "an agreement between two or more persons to pursue an unlawful objective; (2) the defendant[] kn[ew] of the unlawful objective and voluntary agree[d] to join the conspiracy; and (3) an overt act [was committed] by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy." *United States v. Coleman*, 609

F.3d 699, 704 (5th Cir. 2010) (citations omitted). "'The essence of the crime of conspiracy is the agreement rather than the commission of the objective substantive crime. Conspiring to commit a crime is an offense separate and distinct from the crime which may be the object of the conspiracy.'" *United States v. Cantu*, 557 F.2d 1173, 1176–77 (5th Cir. 1977) (quoting *United States v. Nims*, 524 F.2d 123, 126 (5th Cir. 1975)). "The jury may infer a conspiracy agreement from circumstantial evidence . . . and may rely upon presence and association, along with other evidence, in finding that a conspiracy existed." *United States v. Robles–Pantoja*, 887 F.2d 1250, 1254 (5th Cir. 1989) (citations omitted).

Defendants' convictions for conspiracy under § 371 are predicated on a single unlawful objective—violating § 471 by making counterfeit obligations with intent to defraud. As Jalla did in contesting his conviction under §§ 471 and 2, Defendants argue that the scheme at issue did not involve violating § 471. However, as discussed above, the scheme did, in fact, involve violating § 471, and thus Defendants' conspiracy convictions are properly based on the unlawful objective to commit this violation.

Jalla and Ndemba also contend that there was no agreement between two or more persons to pursue the unlawful objective of violating § 471. They argue that Ndemba (1) did not have knowledge that the scheme to steal $60,000 involved making counterfeit obligations and (2) did not participate in making the counterfeit bills used in the scheme. According to Defendants, Jalla acted alone in making the counterfeit bills in his hotel room in Georgia. At trial, Jalla testified that Ndemba had no knowledge at all of the scheme and that, during the trip to New Orleans that ended in the Defendants' arrest, Ndemba thought Jalla was conducting some form of legitimate business. Jalla testified that he never discussed his scheme with Ndemba and that Ndemba merely functioned as his driver throughout their trips to and from New Orleans. Jalla also testified that Ndemba was never within earshot of his conversations about the scheme.

Thus, according to Defendants, there is insufficient evidence to support the convictions for conspiracy because Ndemba did not know about the scheme and thus could not have agreed to participate in Jalla's unlawful objective.

Despite Jalla's testimony to the contrary, however, considerable evidence was presented at trial that Ndemba did have knowledge that the scheme involved counterfeiting and that he voluntarily agreed to pursue this unlawful objective with Jalla. Ndemba did not testify at trial. However, he did sign a sworn statement, admitted into evidence at trial as the Government's Exhibit 26.[3] Joshua Kocher ("Kocher"), a Special Agent of the United States Secret Service, initially drafted the statement, and Ndemba made three minor revisions and one addition. Ndemba's statement ultimately provided:

> I met Jalla in Atlanta about three months ago. He introduced me to a money making scam involving making people think he [was] making CFT money through a complex process involving chemicals. About a week ago I came to New Orleans with Jalla to find people to scam. He found a Middle Eastern guy who was willing to give him $30,000 in exchange for three times that amount. We were never able to find someone to successfully scam in the past. Jalla asked me to take him around to meet people.[4]

In addition, during the recorded conversation between Jalla and Saman (posing as "Ahamed"), Jalla discussed the need to select a good hotel to conduct the counterfeiting operation, voicing concerns about arousing suspicion if security were to see "two white people and two blacks going into a room." Jalla's reference to "two blacks" could have supported the inference that both Jalla and

---

[3] Ndemba refers to the statement as one he "purportedly" made, but does not argue that its contents should be disregarded or considered unreliable.

[4] Ndemba revised the statement originally drafted by Kocher, replacing "we" with "he" in the second and fifth lines and "us" with "him" in the sixth line. Ndemba added the final sentence in his own handwriting.

Ndemba planned to be in the hotel room as the counterfeiting scheme was being conducted.[5]

Testimony from law enforcement also provided a basis for Defendants' convictions under §§ 371 and 471. Saman testified that he met both Defendants in the Office Depot parking lot and talked with both of them about the scheme. According to Saman, both Defendants expressed anxiety about being observed by the police.[6] Special Agent John Waitkus ("Waitkus") of the FBI testified that "Mr. Jalla stated that he . . . would pay Mr. Ndemba 15 to $20,000 depending on the amount of money he scammed out of someone."[7] Waitkus further testified that Jalla stated that both Ndemba and Jalla were going to conduct the scheme. Waitkus also testified that Ndemba told him that "he'd been out of work for quite some time so he needed to come to New Orleans to assist Mr. Jalla in the scam to collect money." Kocher testified that, while conducting surveillance, he had seen both Defendants speaking with "Nick," the confidential informant, at Harrah's Casino.

Jalla and Ndemba focus on the portion of Ndemba's sworn statement that stated that the scam involved *making people think* the Defendants were making counterfeit obligations. They contend that this necessarily implies that, to the best of Ndemba's understanding, counterfeit bills would not actually be made. However, given Ndemba's admission in the sworn statement that he participated in the scheme, Ndemba's other incriminating statements made to law

[5] Jalla testified that he was not referring to himself and Ndemba as the "two blacks" who were going to enter the room. He denied that Ndemba would have gone into the hotel room where the counterfeiting was to occur and explained that his reference to "two blacks" was just a figure of speech connoting two males.

[6] Kocher also testified that he witnessed both Defendants speak to "Ahamed" in the Office Depot parking lot.

[7] Jalla disputed this and testified that he had agreed to pay Ndemba between $1,500 and $2,000. Like Waitkus, however, Kocher testified that he believed Ndemba was to be paid between $15,000 to $20,000, depending on the success of the scam.

enforcement agents,  Jalla's testimony suggesting that Ndemba would be in the room where the scheme would be conducted, and Ndemba's proximity to Jalla during key moments of the scheme, there was sufficient evidence for a jury to have concluded beyond a reasonable doubt that Ndemba knew the scheme involved making counterfeit bills with the intent that a victim believe the bills were real.

Defendants further stress that there is no evidence that Ndemba participated in the actual making of counterfeit bills.  However, Defendants' convictions for conspiracy do not require Ndemba's commission of the unlawful act that was the object of the conspiracy.  *See* 18 U.S.C. § 371.  As discussed above, the crime of conspiracy is distinct from the unlawful objective conspirators agree to pursue.  *See Cantu*, 557 F.2d at 1176–77.  This court's opinion in *United States v. Porter*, 542 F.3d 1088 (5th Cir. 2008), is instructive on this point.  Defendant Crystal Porter ("Porter") appealed her conviction under 18 U.S.C. § 371 of conspiring to make counterfeit obligations in violation of 18 U.S.C. § 471, asserting, *inter alia*, that there was insufficient evidence to support her conviction.[8]  *Id.* at 1089.  Joey Barrett ("Barrett") and his common-law wife, Erica Horton ("Horton"), agreed to settle a debt with a drug dealer named Carlos by making counterfeit currency.  *Id.*  Horton met with Porter, who inspected the fake currency that Carlos and Horton had made and agreed to accept the fake bills at her cash register at Wal-Mart.  *Id.* at 1090.  The next day, Porter allowed Horton and Barrett to purchase $500 in Wal-Mart gift cards with fake currency.  Although Porter did not actually make any counterfeit currency, this court upheld her conviction for conspiracy to make counterfeit obligations, noting that "the bills themselves constitute evidence from which a rational jury . . . could have found beyond a reasonable doubt that . . . before she participated in the

---

[8] Porter was convicted of conspiracy to pass counterfeit obligations under § 472 as well. *See Porter*, 542 F.3d at 1090.

actual passing of the bogus instruments at the Wal-Mart where she worked, Porter affirmatively joined the ongoing conspiracy to *make* counterfeit obligations . . . ." *Id.* at 1092. Thus, the lack of evidence that Ndemba actually made counterfeit bills does not signify that there was insufficient evidence to support his conviction for conspiracy under § 371. We conclude that sufficient evidence supports Defendants' convictions under §§ 371 and 471.

*D. Ndemba's Conviction for Manufacturing Counterfeit United States Currency*

"To convict a defendant of aiding and abetting under 18 U.S.C. § 2, the Government must prove (1) that the defendant associated with the criminal venture, (2) participated in the venture, and (3) sought by action to make the venture succeed." *United States v. Gallo*, 927 F.2d 815, 822 (5th Cir. 1991) (citation omitted); *see also United States v. Stewart*, 145 F.3d 273, 277 (5th Cir. 1998). "To associate with the criminal venture means that the defendant shared in the criminal intent of the principal." *United States v. Jaramillo*, 42 F.3d 920, 923 (5th Cir. 1995). "To participate in the criminal activity means that the defendant acted in some affirmative manner designed to aid the venture." *Id.* (citation omitted). Evidence that supports a conviction for conspiracy can also support a conviction for aiding and abetting. *See Gallo*, 927 F.2d at 822.

Ndemba raises the same arguments with regard to his conviction under §§ 471 and 2 as he did in contesting his conviction under §§ 371 and 471. He insists that there is no evidence that he (1) knew Jalla's scheme involved making actual counterfeit obligations or (2) assisted Jalla in the manufacture of counterfeit bills. However, as discussed above, there is sufficient evidence that Ndemba knew that the scam required the manufacture of counterfeit currency. Also, as noted above, Ndemba engaged in affirmative conduct aimed at making the venture succeed, including renting a car and driving Jalla from New Orleans to Georgia, where Jalla made the counterfeit bills in preparation for the conclusion of Defendants' scheme. Furthermore, there is evidence that Ndemba

14

stood to share in the profits of the venture's success.  Thus, there is sufficient evidence to uphold Ndemba's conviction under §§ 471 and 2.

## III. CONCLUSION

For the reasons stated above, we AFFIRM Defendants' judgments of conviction.